# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FELIX SOLORIO VALDOVINOS,
          *Petitioner-Appellant,*

v.

JOE MCGRATH,
          *Respondent-Appellee.*

No. 08-15918

D.C. No.
4:02-CV-01704-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
September 1, 2009—San Francisco, California

Filed March 10, 2010

Before: Betty B. Fletcher and Andrew J. Kleinfeld,
Circuit Judges, and Kevin Thomas Duffy,* District Judge.

Opinion by Judge B. Fletcher

---

*The Honorable Kevin Thomas Duffy, United States District Judge for
the Southern District of New York, sitting by designation.

**COUNSEL**

Christopher J. Cannon, Sugarman & Cannon, San Francisco, California, for the petitioner-appellant.

Edmund G. Brown, Jr., Dane R. Gillette, Gerald A. Engler, Peggy S. Ruffra, and Jeremy Friedlander, San Francisco, California, for the respondent-appellee.

**OPINION**

B. FLETCHER, Circuit Judge:

Petitioner-Appellant Felix Solorio Valdovinos appeals from the district court's denial of his amended habeas corpus petition challenging his jury conviction of first degree murder. He contends that the government withheld potentially exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that his trial counsel's performance fell below the level required under *Strickland v. Washington*, 466 U.S. 668 (1984). Because a reasonable probability exists that the undisclosed *Brady* material could have altered the result of the proceeding, we reverse in part and remand with instructions to the district court to issue a writ of habeas corpus.

**I.**

On December 1, 1998, a jury convicted Valdovinos of the first degree murder of Nelson Caballero. On May 11, 1998, Caballero was shot outside a San Jose nightclub. The shooter

fired two shots from a .380 caliber semi-automatic handgun, hitting Caballero once in the stomach and once in the head. The murder investigation ultimately led to the arrest of Valdovinos in Oregon in June 1998.

At trial, the prosecution relied heavily on eyewitness testimony implicating Valdovinos in the killing. The prosecution called as eyewitnesses four of Caballero's acquaintances who were present at the shooting. Three of these witnesses identified Valdovinos as the shooter at both the preliminary hearing and trial.

One witness, Joaquin Diaz, testified that the shooter wore a black cowboy hat and a black leather jacket, and had a mustache. Diaz stated that the gunman was approximately the same height as Diaz, who stood five feet, six inches. Diaz also testified that one of the shooter's companions wore cowboy garb and a hat, but was taller than Diaz, and that a third man talking to Caballero at the time of the shooting did not wear any cowboy apparel and was Diaz's height.

Tracy Castro and Kyong "Say" Miranda also witnessed the shooting outside the club. At trial, Castro testified that, as she exited the club that night, she observed a man wearing a white cowboy hat, jeans, and a black waist-length jacket shoot Caballero in the stomach and then in the temple. Castro also testified that the shooter was six feet tall. After the shooting, Castro saw the shooter leave with another person in a gray car.

Miranda testified at trial that the shooter was a Hispanic male wearing a light tan straw cowboy hat, a short leather jacket, and jeans. She said he was tall and slender and had a mustache, and that he drove away in a gray car with a male passenger.

Caballero's girlfriend, Blanca Torres, told the police the shooter wore a black hat, a dark jacket, was a bit muscular, and had a mustache.

Diaz, Castro, and Miranda all identified Valdovinos as the shooter at both the preliminary hearing and trial. Torres could not identify the shooter.

During the course of the investigation, Detective Ernesto Alcantar presented two of the eyewitnesses each with two photographic lineups. A few days after the shooting, Detective Alcantar showed Castro and Diaz each a photo lineup of six Hispanic males with mustaches and short to medium black hair. At that time, Castro did not identify Valdovinos but selected another photograph. Diaz chose the photo of Valdovinos but said he was not certain of the identification.

Several months later, in advance of the preliminary hearing, Detective Alcantar showed Castro and Diaz each a second photographic lineup using a different photograph of Valdovinos. Again, Diaz chose Valdovinos's photo but said he was not sure and Castro identified someone other than Valdovinos.

At the preliminary hearing, Valdovinos's defense attorney, in the presence of the prosecutor and Detective Alcantar, requested a blackboard preliminary hearing, in which a screen prevents the witnesses from seeing the defendant.[1] Defense counsel made the request based on a review of police reports indicating the witnesses had never seen a lineup or photo lineup. Neither the prosecutor nor Detective Alcantar informed the court or defense counsel that the witnesses already had seen photo lineups including Valdovinos's photo, or that Diaz tentatively had identified Valdovinos's photo whereas Castro had chosen different photographs. The court denied the defense attorney's request.

---

[1]A blackboard preliminary hearing takes place when the witnesses have not made any prior identifications of the defendant. A screen blocks the witness's view of the defendant so that when the witness later is asked to make an identification at trial, the witness will not already have seen the defendant at the preliminary hearing.

Defense counsel did not learn of the photo lineups until cross-examination of Diaz during trial. Detective Alcantar later testified he had administered two separate photo lineups.

Upon learning of the non-disclosure of the previous photographic lineups, defense counsel moved for a dismissal. The trial court determined that the non-disclosure of the photo lineups fell within the purview of *Brady v. Maryland*, 373 U.S. 83 (1963). However, the court denied the motion to dismiss because it found that the prosecution did not intentionally conceal the exculpatory evidence and therefore did not act in bad faith. The court read a corrective jury instruction and offered defense counsel a continuance, which counsel did not take.

Also at trial, the prosecution read into the record the preliminary hearing testimony of Aurelio Lopez and his unsworn statement to the police. Lopez and another man, Isidro Garcia, both of whom resided with Valdovinos, were at the club on the night of the shooting. Lopez was scheduled to testify for the prosecution at trial, but could not be located once the trial started. Defense counsel objected to the court declaring Lopez unavailable and permitting the introduction of his preliminary hearing testimony, but did not object to the admission of Lopez's out-of-court statement.

As part of the investigation, Detective Alcantar and Police Sergeant Pete Ramirez visited Valdovinos's apartment. Valdovinos was not home, but Lopez and Garcia were present. The police received consent to search the apartment and found an ounce of methamphetamine and a nine millimeter gun in Lopez's bedroom. They arrested Lopez on an outstanding warrant for drug and gun possession. Police never brought new gun and drug possession charges against Lopez.

The same day, the detectives interviewed Lopez and Garcia at the police station. When they asked Lopez if he had seen Valdovinos with a weapon on the night of the shooting, Lopez

said he did but did not know what kind. When questioned further, Lopez stated that the weapon was a gun. Lopez later contradicted this statement while testifying at the preliminary hearing.

At trial, Garcia testified that many people at the nightclub on the night of the shooting were dressed similarly, and that both Valdovinos and Lopez wore hats and black jackets. Garcia was wearing a black leather jacket, black pants, and boots, but no hat. Garcia testified that he and Lopez were exiting the club when Caballero was shot. Garcia said he had heard two shots and had seen Caballero on the ground.

At the preliminary hearing, Lopez admitted that he told Detective Alcantar that he had seen Valdovinos with a gun, but testified that his statements to Detective Alcantar were not truthful. Lopez explained that he was afraid that he himself might be a suspect and told Detective Alcantar what he wanted to hear. Detective Alcantar did not include a photograph of Lopez in either lineup, but testified at trial that Lopez was similar in size and stature to Valdovinos.

At trial, Detective Alcantar testified that Sergeant Ramirez had found methamphetamine and a gun in Lopez's bedroom when police arrested Lopez. This testimony was the first time defense counsel had heard of the methamphetamine and gun found in Lopez's bedroom.

Again, based on the untimely disclosure of favorable evidence, Valdovinos's defense counsel moved for a mistrial, arguing that Lopez's possession of the gun and drugs could have been used to impeach his testimony at the preliminary hearing and that, without this evidence, counsel had been unable to cross-examine Lopez effectively at the preliminary hearing. The court denied the request for a mistrial, finding that the prejudicial impact of the untimely disclosure did not warrant a mistrial. The jury convicted Valdovinos at the close of the seven-day trial.

A state appellate court affirmed the judgment on August 23, 2000. Valdovinos filed a pro se petition for a writ of habeas corpus in the California Supreme Court on June 29, 2001, which the state Supreme Court denied on December 19, 2001. Valdovinos's pro se federal habeas corpus petition followed on April 10, 2002.

The district court appointed habeas counsel for Valdovinos. After a review of the prosecution's case file yielded additional undisclosed evidence, Valdovinos's habeas counsel amended the habeas petition to include this new evidence. In a traverse accompanying the amended petition, counsel pointed to four types of newly discovered evidence.

First, the prosecutor's case file contained an undisclosed anonymous letter purportedly sent to Caballero's family stating that Caballero's murder was a contract killing over a debt. Second, habeas counsel obtained a written statement from a man named Juan Ledezma stating that Lopez had told Ledezma that Lopez had two guns of different calibers, Lopez had killed someone at a bar in San Jose and blamed Valdovinos, and Lopez had told his brother to throw out the gun used in the killing. The third piece of newly discovered evidence was a photograph from the police file taken by police on the night of the shooting. The man in the photo, identified as Jose Mongia, is wearing a black hat and black leather jacket in the photo — the same items eyewitnesses testified the shooter wore. Habeas counsel also included in the amended petition additional information regarding the gun and drugs found in Lopez's possession during the apartment search in 1998.

The district court found the new evidence rendered Valdovinos's claims unexhausted and ordered a stay on December 3, 2004, to allow Valdovinos to exhaust his remedies in state court. Nine months later, on September 9, 2005, Valdovinos filed his second state habeas petition, this time containing the previously unexhausted claims. The Supreme

Court denied this petition on July 26, 2006. On August 23, 2006, the district court ordered Valdovinos to file a motion to amend the stayed petition within two weeks. Valdovinos filed his motion to amend three weeks later, on September 14, 2006.

The district court denied relief on March 12, 2008, and certified two issues for appeal: (1) whether the *Brady* violations denied Valdovinos due process; and (2) whether Valdovinos's trial counsel provided ineffective assistance by failing to object to the prosecution's introduction of Lopez's out-of-court statements.[2] In addition, the state appeals the district court's decision to allow Valdovinos to amend his habeas petition.[3] We have jurisdiction under 28 U.S.C. § 2253.

## II.

We first determine whether the district court erred in staying Valdovinos's petition while he exhausted additional claims in state court and allowing Valdovinos to amend his habeas petition. We review for abuse of discretion a district court's stay and abeyance of a mixed petition containing both exhausted and unexhausted claims. *Rhines v. Weber*, 544 U.S. 269, 279 (2005). We also review for abuse of discretion a district court's decision to allow a habeas petitioner to amend his petition. *Hebner v. McGrath*, 543 F.3d 1133, 1136 (9th Cir. 2008). We find the district court did not abuse its discretion in granting the stay or allowing the amendment.

## A.

The district court ordered a stay on December 3, 2004, to permit Valdovinos to exhaust his remedies in state court. Nine

---

[2]Valdovinos raises an uncertified issue in his opening brief. We decline to expand the scope of the COA to include the uncertified issue.

[3]The state is not required to obtain a COA before raising an issue on appeal. Fed. R. App. P. 22(b)(3).

months later, on September 9, 2005, Valdovinos filed a second state habeas petition containing the unexhausted claims with the California Supreme Court. The state Supreme Court denied this petition on July 26, 2006 and, on August 23, 2006, the district court ordered Valdovinos to file a motion to amend the stayed petition within two weeks. Valdovinos filed his motion to amend on September 14, 2006.

The state opposed the motion to amend, arguing that Valdovinos did not act within a reasonable time to exhaust his state remedies because he did not file his second state habeas petition until nine months after the district court entered the stay. The district court rejected this argument, finding that the delay provided insufficient grounds upon which to deny Valdovinos's motion to amend the petition.

[1] In *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court examined the manner in which courts should treat mixed petitions containing both exhausted and unexhausted claims in light of the Antiterrorism and Effective Death Penalty Act's ("AEDPA") one-year time limit on the filing of federal habeas corpus petitions. The Supreme Court held that a district court has discretion to grant a stay and abeyance of a mixed petition so that a petitioner may exhaust the unexhausted claims in state court before returning to federal court for review of a "perfected petition." *Id.* at 278. *Rhines* struck a balance between the congressional intent behind AEDPA — to "reduce delays in the execution of state and federal criminal sentences, particularly in capital cases," *id.* at 276 (citations omitted) — and the preservation of petitioners' rights to federal review of their claims. *Id.* at 277.

*Rhines* opined that a district court would likely abuse its discretion in denying such a stay where "the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory tactics." *Id.* at 278. Although *Rhines* directed district courts to "place reasonable

time limits on a petitioner's trip to state court and back," *id.* at 278, the Court left the determination of that time limit to the discretion of the district court.

**[2]** Here, the district court did not abuse its discretion in finding Valdovinos satisfied the elements of *Rhines*. First, the Supreme Court decided *Rhines* after the district court here issued the stay without imposing a specific time limit within which Valdovinos had to file his petition in state court. The district court reasoned that retroactively imposing a time limit would have been inappropriate and emphasized that Valdovinos had not engaged in dilatory tactics and had no motivation for delay, as he is not a capital defendant. The court also noted that Valdovinos did not bear the blame for omitting the additional evidence rendering his claims unexhausted because he had no knowledge of it due to the misconduct of the prosecution. We agree. Thus, we hold that the district court did not abuse its discretion in allowing the amendments to the original habeas petition.

## B.

We next must determine if the amendments arise "from the same core facts as the timely filed claim" such that they relate back to the original, timely petition. *Mayle v. Felix*, 545 U.S. 644, 657 (2005). Following the Supreme Court's test in *Mayle*, we hold that the new evidence in the amended habeas petition properly relates back to the claims raised in the initial petition.

**[3]** Federal Rule of Civil Procedure 15(c) governs amendments to pleadings in habeas proceedings, which are characterized as civil in nature. 28 U.S.C. § 2242. Rule 15(c) instructs: "An amendment of a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. Rule Civ. P. 15(c). In *Mayle*, the

Supreme Court held that "claims added by amendment [must] arise from the same core facts as the timely filed claims," and must not be "separate in both time and type from the originally raised episodes." *Mayle*, 545 U.S. at 657 (quotation and citation omitted). Thus, we review the district court's finding that the new claims related back under the *Mayle* standard.

**1.**

We first examine Valdovinos's *Brady* claims. The original petition alleged that Valdovinos was denied due process and a fair trial by the prosecution's withholding of the prior photo lineups, evidence of the drugs and gun found in Lopez's possession, and the favorable treatment Lopez received for his testimony. The amendments seek to add that the prosecutor violated *Brady* by not disclosing the anonymous letter and the Mongia photograph.

The district court held that Valdovinos's revised *Brady* claim related back to the *Brady* claim in the original petition. We agree.

This case is similar to *Mandacina v. United States*, 328 F.3d 995 (8th Cir. 2003), which the *Mayle* court cited with approval. *Mayle*, 545 U.S. at 664, n.7. In *Mandacina*, the original petition alleged that the government had failed to disclose exculpatory evidence. *Mandacina*, 328 F.3d at 1000. The petitioner sought to amend his habeas petition to include the "Borland Report," to which the original petition made no reference. *Id.* The Eighth Circuit concluded that the amended claim related back to the original petition because the content of the report was "evidence of other suspects obtained by" the police department during the murder investigation. *Id.* at 1001.

**[4]** Here, both the original and amended claims pertain to suppressed exculpatory evidence originating from materials from the police investigation. Each claim, therefore, is of the

same type — exculpatory information the government had in its file — that the government failed to disclose at the required time. As in *Mandacina*, "[t]he *Brady* claims in the original [petition] . . . satisfy Rule 15(c) by providing the government with the notice that the statutes of limitation were intended to provide." *Id.* Therefore, we hold that the district court did not abuse its discretion in permitting the amendments to the *Brady* claims.

**2.**

[5] We next examine Valdovinos's ineffective assistance of counsel claim. The original petition alleged ineffective assistance of counsel; the amended petition seeks to add new evidence supporting the claim. The claim has not changed, but habeas counsel argues the four pieces of newly discovered evidence "provide a more concrete basis for demonstrating prejudice" under *Strickland v. Washington*, 466 U.S. 668 (1984). The four new pieces of evidence are: (1) the photograph of Mongia; (2) the statement by Ledezma implicating Lopez; (3) the anonymous letter; and (4) police documents concerning the drugs and gun found in Lopez's possession.

[6] The district court found that the amended claim arose from the same conduct, transaction, or occurrence as set forth in the original pleading, and that the government had received notice of the claim in the original pleading. The original ineffective assistance of counsel claim alleged counsel did not adequately investigate suppressed exculpatory evidence upon learning of it. The amended petition simply adds more evidence that counsel did not uncover in its original investigation. The original petition provided notice of this claim, as the district court found. Therefore, the district court did not abuse its discretion in permitting amendment of the original habeas petition to add newly discovered evidence supporting both the *Brady* and the ineffective assistance of counsel claim.

## III.

In accordance with the standard set forth in AEDPA, a court may grant a writ of habeas corpus only if the state court's ruling:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quotations and citations omitted).

In the event that the state court issues a summary denial of the habeas petition, the district court conducts an independent review of the record. *Richter v. Hickman*, 578 F.3d 944, 952 (9th Cir. 2009) (en banc). This court reviews de novo the district court's denial of habeas relief. *Id.*

### A.

[7] We turn now to the substance of Valdovinos's *Brady* claim. As the Supreme Court recently articulated, "[a]lthough the State is obliged to 'prosecute with earnestness and vigor,' it 'is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every

legitimate means to bring about a just one.' " *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1782 (2009) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). The Court has long held that the suppression of evidence favorable to an accused violates due process of law, regardless of whether the prosecution suppresses the evidence in good or bad faith. *Brady*, 373 U.S. at 87. As the Supreme Court explained in *Brady*, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.* Thus, "when the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment." *Cone*, 129 S. Ct. at 1782 (citing *Brady*, 373 U.S. at 87).

**[8]** A *Brady* claim is composed of three necessary elements: "(1) [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching, (2) that evidence must have been suppressed by the State, and (3) prejudice must have ensued." *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008) (quotations and citation omitted). "To determine whether prejudice exists, we look to the materiality of the suppressed evidence." *Id.* "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 129 S. Ct. at 1783; *United States v. Jernigan*, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc). In other words, a defendant need not show that he "would more likely than not have received a different verdict with the evidence." *Jernigan*, 492 F.3d at 1054 (quotation and citation omitted). Instead, he must show only that "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quotation and citation omitted). A court must consider the materiality of the *Brady* violations collectively rather than item by item. *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995).

The four new pieces of evidence are: (1) the photograph of Mongia; (2) the anonymous letter; (3) police documents concerning the drugs and gun found in Lopez's possession; and (4) the Ledezma statement implicating Lopez. The last piece of evidence, however, is not *Brady* material because it was obtained by Valdovinos's habeas counsel and never was part of the prosecution's file.

**1.**

Valdovinos's habeas counsel stated in a declaration in support of the amended petition that the prosecution's file contained photographs of several of the witnesses police interviewed at the nightclub on the night of the shooting. One such photo shows a man named Jose Mongia wearing a black cowboy hat and a black leather jacket, the same items allegedly worn by the shooter.

Valdovinos argues that the prosecution's failure to disclose the Mongia photograph was material because the state court found that Valdovinos was the only one at the crime scene consistently described as wearing a cowboy hat. The district court rejected Valdovinos's *Brady* claim as to the Mongia photo because any evidence indicating the authenticity of the photograph is lacking and therefore the court could not conclude the photograph would have affected the trial in any way. The state contends that the non-disclosure was not material because Mongia cannot be the shooter because several witnesses stated the shooter fled the scene of the crime; Mongia did not flee since he was available for questioning.

**[9]** In conducting its *Brady* analysis, the district court ignored the possibility that the disclosure of the photo could have added uncertainty to the identifications of Valdovinos as the shooter. Various inconsistencies existed between the witnesses' testimony about the shooter's appearance: one witness testified the shooter wore a black cowboy hat and a black leather jacket, stood five-and-a-half feet tall, and had a mus-

tache; another testified that the shooter wore a white cowboy hat, a black leather jacket, and was six feet tall, and initially insisted the shooter had no facial hair; a third witness testified that the shooter wore a light tan straw hat, a black leather jacket, and stood over six feet; and a fourth witness hesitantly described the shooter as wearing a black hat and black leather jacket. These inconsistencies bolster a finding of materiality with regard to the Mongia photo. The photograph has the potential to undermine the significance of the single commonality of these descriptions — the cowboy hat — that the court identified as one of the stand-out characteristics of the shooter. The fact that many people at the scene that night actually shared this characteristic, including Mongia, tends to "undermine[ ] confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quotation and citation omitted). Furthermore, had the prosecution fulfilled its obligations under *Brady* and turned this photograph over in a timely manner, the defense could have elicited testimony from the police to authenticate it.

**2.**

The second piece of evidence added in the amended petition is an anonymous letter addressed to Eulalio Caballero found in the prosecution's file. The letter suggests that Nelson Caballero owed a debt to someone named Ramon Balemos, and that Balemos paid someone with money and drugs to kill Caballero. Valdovinos's trial attorney stated in a declaration that he had never seen the letter.

The district court found that the letter qualified as *Brady* material, but rejected the claim because its disclosure did not raise any doubt about the verdict, given that the letter was ambiguous and anonymous and thus inadmissable. The district court further concluded the letter would not have led to any admissible exculpatory evidence.

Valdovinos puts forth several arguments tending to show the letter's materiality. First, he argues that the prosecution's

non-disclosure prevented the defense from conducting a proper investigation, and there is no way to know whether the trial could have been affected by the results of that investigation. Valdovinos next argues that the letter impeached the testimony of Detective Alcantar, who testified that there was no evidence in the case indicating that the murder was drug related. Defense counsel argued during closing arguments that Caballero was a drug dealer and that Lopez was a known drug user, and that drugs could have been the motive for the crime. In addition, police found a small baggy of a powdery substance containing cocaine between two cars near a corner of the club. And blood reports showed that Caballero had ingested cocaine and methamphetamine in the hours before his death.

**[10]** Undeniably, the letter at this point is unauthenticated and unreliable. Nonetheless, the letter could have been of some value to the defense, particularly if disclosed at the time police received it. Given the conflicting identification testimony and a letter pointing to another culprit, the non-disclosure of the letter denied the defense important investigative opportunities that had the potential to lead to admissible evidence. Moreover, only law enforcement officials are in a position to authenticate the letter, to say how and when the letter came to be in the file — a task that might have been possible had the prosecution disclosed the letter when it was received.

### 3.

We next turn to the suppressed evidence revealed during trial. The prosecutor did not disclose before trial that, when arrested, Lopez was found in possession of an ounce of methamphetamine and a handgun. Defense counsel learned of this evidence during the direct examination of Detective Alcantar. Defense counsel immediately moved for a mistrial, which the trial court denied.

Valdovinos's direct appeal raised this issue in the form of a Confrontation Clause issue, arguing that the non-disclosure prevented a meaningful opportunity to cross-examine Lopez at the preliminary hearing. The California Court of Appeals rejected this argument because it found that a cross-examination of Lopez that included this information would not have affected the trial. The court reasoned that defense counsel raised the issue at closing and suggested to the jury that Lopez might be the killer, that Lopez's statements at the preliminary hearing were conflicting and indicated Lopez might have been covering for Valdovinos, and that defense counsel used the information to argue to the jury that Lopez was telling the authorities what they wanted to hear to escape charges for this possession.

**[11]** The Supreme Court has held that a *Brady* violation is material if it "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quotation and citation omitted). Here, the appellate court found that further impeachment of Lopez would not have affected the trial or outcome. On its own, this finding is neither contrary to nor an unreasonable application of established federal law. However, we include the prosecutor's failure to disclose the gun and methamphetamine in the cumulative analysis below.

## 4.

We now review the materiality of the suppressed evidence collectively. *Kyles*, 514 U.S. at 436; *see also Jackson*, 513 F.3d at 1071. The California court did not have cause to consider the cumulative *Brady* impact because it had before it only the *Brady* claim based on the undisclosed photo lineups. The district court considered the collective impact of the photo lineups, the Lopez impeachment information, the anonymous letter, and the photograph of Mongia. The district court concluded that, given the strength of the evidence against Valdovinos, the cumulative impact of the evidence did not cast doubt on the trial verdict.

This court reviews the district court's holding de novo. *Richter*, 578 F.3d at 951. In conducting the prejudice inquiry, "[w]e may find a 'reasonable probability' [of a different result] even where the remaining evidence would have been sufficient to convict the defendant. Moreover, we may find a 'reasonable probability' without finding that the outcome would more likely than not have been different." *Jackson*, 513 F.3d at 1071 (citations omitted). The question is whether, in light of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 1079 (quotation and citation omitted).

**[12]** When considered collectively, the suppressed evidence undermines confidence in the verdict. The Mongia photograph has the potential to weaken the identification testimony by showing that the stand-out characteristic of the shooter — the cowboy hat — was not unique to Valdovinos. The district court relied on the fact that the anonymous letter and the photograph would have been inadmissible at trial. But that conclusion is a product of the circumstances under which they were discovered — belatedly, in the prosecution's file at a police station, by an associate habeas counsel. And while the non-disclosure of the photo lineups did not result in a finding of materiality on its own, as this court has noted, "each additional . . . *Brady* violation further undermines our confidence in the decision-making process." *Id*. at 1072.

**[13]** Significantly, both the state court and the district court's findings of no prejudice relied heavily on the "strong" eyewitness testimony. But the eyewitness testimony was contradictory about the shooter's physical appearance, his size, build, and what he was wearing. The photo lineup evidence renders the identifications questionable. Castro identified Valdovinos as the shooter at the preliminary hearing, but she picked a person other than Valdovinos in both lineups. Diaz also identified Valdovinos at the preliminary hearing, but could not identify him from the photo lineups with any degree of certainty. And Valdovinos was the only person included in

both photo lineups, despite the fact that Lopez, who also was present at the nightclub that night, was similar in build and stature to Valdovinos. The failure to disclose the gun and drugs found in Lopez's possession, even if not prejudicial on its own, only further solidifies our finding of collective prejudice.

**[14]** We find the cumulative effect of the suppressed evidence denied Valdovinos a fair trial. The prosecution's repeated failure to disclose evidence favorable to the defense leads us to conclude that Valdovinos did not receive a fair trial resulting in a verdict worthy of confidence. Thus, we reverse with regard to the *Brady* claim and remand with instructions to the district court to issue a writ of habeas corpus.

## B.

Valdovinos claims his trial counsel provided ineffective assistance by failing to object to pre-trial statements that Lopez made to investigating police, which the prosecution introduced through the testimony of Sergeant Ramirez.

Valdovinos initially raised this claim in the state appellate court, challenging the trial court's decision to permit the introduction of Lopez's out-of-court statements. In its ruling, the court first held that Valdovinos had waived the right to appeal the introduction of Lopez's statement to police. The court then held that, "[a]ny argument that counsel was ineffective for failing to object is also unavailing."

**[15]** To prevail on an ineffective assistance of counsel claim, a petitioner must establish: (1) that counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness; and (2) that he was prejudiced by the performance, that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Wash-*

*ington*, 466 U.S. 668, 694 (1984). Trial counsel's failure to object to evidence inadmissible under state law can constitute deficient performance under *Strickland*. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996).

The state court observed that Valdovinos's trial counsel highlighted the inconsistencies in Lopez's statement to police at the preliminary hearing. Lopez testified during the preliminary hearing that he told police he saw Valdovinos with a gun, but that he did not actually know if it was a gun. Sergeant Ramirez's testimony at trial about Lopez's statement revealed the same: While Lopez ultimately stated that Valdovinos had a gun, Lopez was anything but convincing. Sergeant Ramirez testified that Lopez told police he had seen Valdovinos with a small pistol. However, Lopez also stated during his police interview that he could not see Valdovinos at the time of the shooting. When Detective Alcantar asked Lopez during the interview to describe the gun, Lopez initially stated he did not know and could not say.

**[16]** While the state court failed to conduct the inquiry under the *Strickland* framework, the result of the analysis would be the same. The court found trial counsel's failure to object did not prejudice Valdovinos. The district court agreed: "Lopez's testimony was internally contradictory and did not strongly incriminate Petitioner." There did not exist, therefore, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Having found no prejudice, the state court did not err in declining to investigate the deficient performance prong. *Id.* at 697 ("[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

**[17]** Therefore, we affirm the district court's finding that

the state court's decision was neither contrary to federal law nor an unreasonable application of the law to the facts.[4]

## Conclusion

A pattern of non-disclosure permeated the proceedings against Valdovinos. "By suppressing this evidence, the prosecution arrogated to itself a central function belonging to the criminal jury and pursued its role as adversary to the exclusion of its role as architect of a just trial." *Jernigan*, 492 F.3d at 1057. In so doing, the government deprived Valdovinos of his due process rights. Because the collective effect of the *Brady* evidence was material, we remand this case to the district court with instructions to issue the writ of habeas corpus, unless California elects to retry Valdovinos within a time period the district court specifies.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** with instructions to issue a writ of habeas corpus unless California elects to conduct a new trial within the time period the district court specifies.

---

[4]We note, however, that both the state court and the district court relied on the eyewitness evidence against Valdovinos to support a finding of no prejudice. The *Brady* violations warranting habeas relief negate the strength of this evidence. *Cf. Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). However, because we find the *Brady* violations alone warrant habeas relief, we need not consider the cumulative prejudice of the *Brady* violations with the ineffective assistance of counsel claim. *See Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).