**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 28, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

TROY MICHAEL KELL,

      Petitioner - Appellee,

v.

LARRY BENZON, Warden Utah
State Prison,

      Respondent - Appellant.

No. 17-4191

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:07-CV-00359-CW)**
_____

Andrew F. Peterson, Assistant Solicitor General (Tyler R. Green, Utah
Solicitor General, Thomas Brunker, Deputy Solicitor General, Daniel W.
Boyer, Assistant Solicitor General, Sean D. Reyes, Utah Attorney General,
Salt Lake City, Utah, with him on the briefs), for Respondent-Appellant.

Lindsey Layer, Assistant Federal Public Defender, Salt Lake City, Utah
(Jon M. Sands, Federal Public Defender for the District of Arizona,
Alexandra LeClair, Assistant Federal Public Defender, Salt Lake City,
Utah, with him on the briefs), for Petitioner-Appellee.
_____

Before **BACHARACH**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

This is an interlocutory appeal from an order staying a habeas proceeding. We lack jurisdiction and dismiss the appeal.

Mr. Troy Kell sought habeas relief, but he had not exhausted two of his claims in state court. The unexhausted claims created a Catch-22 for Mr. Kell, risking a dismissal of all of his claims without an opportunity to timely refile. To relieve Mr. Kell of this Catch-22, the district court entered a limited stay, halting proceedings on one of the unexhausted claims while Mr. Kell returned to state court to exhaust the claim. For the remaining habeas claims, however, the district court continued with the proceedings.

In the midst of the ongoing habeas proceedings in district court, Utah appealed from the grant of a stay, arguing that the district court should have declined to grant a stay. Our threshold question involves appellate jurisdiction. To establish jurisdiction, Utah relies on the collateral-order doctrine, which allows appeals from some decisions before the entry of a final judgment. But the district court's issuance of a stay does not satisfy the collateral-order doctrine's requirements, so we dismiss the appeal for lack of appellate jurisdiction.

## 1. Mr. Kell timely files a habeas petition.

Mr. Kell was convicted of murder and sentenced to death in Utah, and his conviction became final roughly sixteen years ago. Mr. Kell then had one year to seek federal habeas relief, but the one-year limitations

2

period was tolled while he pursued state post-conviction remedies. 28 U.S.C. § 2244(d). When the state post-conviction proceedings ended in 2009, Mr. Kell timely filed a federal habeas petition.

**2. The district court stays the habeas case to allow Mr. Kell to exhaust a new claim.**

In 2013, Mr. Kell asserted two new habeas claims: (1) that the trial court had improperly commented to the jury that Mr. Kell bore the burden in the penalty phase to show that his life should be spared and (2) that the jurors had improperly considered extraneous information. Mr. Kell had not exhausted the two new claims, so the district court needed to grapple with how to proceed. Continuing with the new habeas claims could prevent consideration of any of the claims because a federal district court must ordinarily dismiss the entire petition when one or more of the habeas claims are unexhausted. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Given the possibility of dismissal, Mr. Kell faced a dilemma: If the district court were to dismiss the habeas petition and he later refiled in federal court, the statute of limitations might have expired on all of his claims.

To avoid this dilemma, Mr. Kell requested a stay so that he could exhaust his new habeas claims in state court. For this request, Mr. Kell invoked a procedure adopted in *Rhines v. Weber*, 544 U.S. 269 (2005). Under *Rhines*, a district court may stay habeas proceedings to permit exhaustion of a claim upon satisfaction of three elements:

3

1.    "Good cause" exists for the failure to exhaust the claim.

2.    The unexhausted claim is "potentially meritorious."

3.    The petitioner did not engage in "abusive litigation tactics" or intentionally delay the proceedings.

*Rhines*, 544 U.S. at 277–78. The district court declined to stay the claim involving extraneous influence on the jury, concluding that this claim lacked potential merit. But the district court granted the stay on the claim involving the judge's comment to the jury, concluding that Mr. Kell had satisfied the three elements for a *Rhines* stay. For the remaining habeas claims, however, the district court stated that the proceedings would continue without interruption.[1]

**3.    Utah appeals the order granting a limited stay.**

In this appeal, Utah argues that the federal district court erred in granting the stay because

- the court used the wrong test for "good cause" and misapplied that test,

- the new habeas claim lacks potential merit based on timeliness, the existence of a procedural default, and the absence of a constitutional violation, and

- Mr. Kell was dilatory by waiting over three years to assert the new habeas claim and over eight years to seek a stay based on this claim.

---

[1]    As the dissent points out, the district court denied certification of an interlocutory appeal. In denying certification, the district court reasoned that an interlocutory appeal would slow the litigation.

4

**4.    We lack jurisdiction to consider interlocutory appeals from *Rhines* stays.**

We can consider these arguments only if Utah establishes appellate jurisdiction. *See EEOC v. PJ Utah, L.L.C.*, 822 F.3d 536, 542 n.7 (10th Cir. 2016) ("[T]he appellant . . . bears the burden to establish appellate jurisdiction."). We typically acquire jurisdiction through the district court's entry of a final decision. 28 U.S.C. § 1291. But a stay does not ordinarily constitute a final decision. *See Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1176 (10th Cir. 2005) ("If a stay merely delays litigation and does not effectively terminate proceedings, it is not considered a final decision.").

Utah argues that we nonetheless have jurisdiction under the collateral-order doctrine. This doctrine would apply only if the district court's decision

- conclusively decided the disputed question,

- resolved an important issue separate from the merits, and

- could not be effectively reviewed on direct appeal.

*Van Cauwenberghe v. Biard*, 486 U.S. 517, 522 (1988). The failure to satisfy any of the three elements would prevent us from applying the collateral-order doctrine. *See Stubblefield v. Windsor Capital Grp.*, 74 F.3d 990, 997 (10th Cir. 1996) (stating that the collateral-order doctrine "does not apply unless each of the three requirements are met").

Each element is considered stringent. *E.g.*, *Flanagan v. United States*, 465 U.S. 259, 270 (1984). And "[i]n case after case in year after year, the Supreme Court has issued increasingly emphatic instructions that the class of cases capable of satisfying this 'stringent' test should be understood as 'small,' 'modest,' and 'narrow.'" *United States v. Wampler*, 624 F.3d 1330, 1334 (10th Cir. 2010) (Gorsuch, J.). Utah bears the burden on each element of this "stringent" test. *See Los Lobos Renewable Power, L.L.C. v. Americulture, Inc.*, 885 F.3d 659, 664 (10th Cir. 2018) (stating that the "party asserting jurisdiction under the collateral order doctrine" bears the burden on each element).

We assume, for the sake of argument, that an order issuing a *Rhines* stay conclusively determines the disputed question. But the grant of a *Rhines* stay involves issues that are intertwined with the merits and reviewable on direct appeal. We thus lack jurisdiction under the collateral-order doctrine. *See Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1178 (10th Cir. 2005) (noting that the collateral-order doctrine does not support appellate jurisdiction if any element is unsatisfied).

## A. The grant of a *Rhines* stay is not completely separate from the merits.

The collateral-order doctrine applies only when the order involves an important issue that is not intertwined with the merits. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978). For this element, Utah must show

6

that the issues bearing on the appropriateness of a *Rhines* stay are "completely separate" from the merits. *E.g.*, *Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 205 (1999). Utah has not made this showing.

## 1.    Avoidance of Piecemeal Litigation

The requirement of complete separation is designed to prevent piecemeal appellate review. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 527 (1988). Given this purpose, the collateral-order doctrine would ordinarily apply only if an appellate court would probably not need to consider the merits a second time.[2]

But interlocutory appeals of *Rhines* stays would often require federal appellate courts to consider the merits at least twice:

- once in the interlocutory appeal (when the respondent argues that a *Rhines* stay is improper because the petitioner's unexhausted claim lacks potential merit) and

- again after entry of the judgment (when the parties disagree over the claim's actual merit).

---

[2]    The Supreme Court has explained:

The requirement that the matter be separate from the merits of the action itself means that review *now* is less likely to force the appellate court to consider approximately the same (or a very similar) matter more than once, and also seems less likely to delay trial court proceeds (for, if the matter is truly collateral, those proceedings might continue while the appeal is pending).

*Johnson v. Jones*, 515 U.S. 304, 311 (1995) (emphasis in original).

7

And if the district court enters multiple *Rhines* stays,[3] we could face three or more appeals with overlapping issues.

This possibility is apparent here. For example, consider Utah's argument that the district court's jury instruction was correct. This argument involves a classic issue on the merits. *See Gillette v. Prosper*, 858 F.3d 833, 839 (3d Cir. 2017) (concluding that the order being appealed was "closely related" to the merits because "both concern[ed] alleged constitutional violations" and involved potential release from prison). If we were to recognize appellate jurisdiction at this stage and Mr. Kell were to obtain habeas relief, we would decide the "potential merit" of Mr. Kell's new claim now and the claim's "actual merit" after the entry of a final judgment. It is hard to imagine a better example of piecemeal litigation— precisely what the Supreme Court has tried to avoid by limiting the collateral-order doctrine to classes of orders involving "complete separation" from the merits.

The dissent disagrees:

> Even where a district court issues multiple *Rhines* stays, each *Rhines* stay concerns different claims by a petitioner and therefore different issues. To illustrate, a district court issues a *Rhines* stay on claim *x*, allowing the petitioner to exhaust the claim in state court. After the petitioner exhausts claim *x* in state court and returns to federal court, the district court is not going to issue another *Rhines* stay for the purpose of allowing the

---

[3]     Here, for example, the district court granted two *Rhines* stays. Our appeal involves only the second stay.

petitioner to exhaust claim *x*. If there is a second *Rhines* stay, it would be issued for the petitioner to exhaust claim *y*. If both of these *Rhines* stays are appealed, and then the final judgment is appealed, the "same issues" would *not* be before this Court *three or more* times.

Dissent at 16–17 n.5 (emphasis in original).

We respectfully think that the dissent has misunderstood us. When reviewing a *Rhines* stay, we consider the "potential merit" of the unexhausted claim. For example, let's consider Utah's argument that the district court erred in granting a stay because the unexhausted habeas claim lacks potential merit. If we have appellate jurisdiction under the collateral-order doctrine, we would consider whether the district court acted within its discretion in treating the unexhausted claim as potentially meritorious.

Let's assume, for the sake of argument, that we were to uphold this determination. When the habeas case ends in district court, the parties could appeal the district court's ultimate determination of the claim's actual merit. *See Alexander v. U.S. Parole Comm'n*, 514 F.3d 1083, 1087 (10th Cir. 2008) (stating that a conditional writ of habeas corpus is final, creating appellate jurisdiction); *Burton v. Johnson*, 975 F.2d 690, 693–94 (10th Cir. 1992) (stating that a conditional writ of habeas corpus was an appealable final judgment).

The same would be true for any case involving a *Rhines* stay. So in a case with multiple *Rhines* stays and multiple interlocutory appeals, we

9

could face the same issues after a final judgment (even if the interlocutory appeals individually involved different issues).

## 2. The Significance of the Relationship Between the *Rhines* Factor of "Potential Merit" and the Actual Merits of Mr. Kell's New Claim

Because "potential merit" is essential for *Rhines* stays, interlocutory review would frequently require us to consider the potential merit of the underlying habeas claims. And "potential merit" is obviously not "completely separate" from the actual merits. The dissent agrees, stating that the *Rhines* issue ("potential merit") "undoubtedly overlaps with the merits." Dissent at 16.[4]

---

[4] Utah and the dissent downplay the significance of this relationship between the two, calling "potential merit" a "fraction of a fraction" of the test governing grants of *Rhines* stays. Appellant's Reply Br. at 5; Dissent at 16.

It is true that potential merit is just one element for a *Rhines* stay. But a court can enter a *Rhines* stay only if the unexhausted claim has potential merit. *See* pp. 3–4, above. Thus, potential merit may be a "fraction" of the test, but it is a requirement in any *Rhines* stay.

Utah also asserts that the "underlying merit of a habeas claim is only a fraction of the 'potential merit' factor." Appellant's Reply Br. at 5. We are not sure why Utah regards "potential merit" under *Rhines* as more inclusive than the actual merit of a habeas claim, and Utah supplies no explanation. Even if Utah were right, however, it has not explained how the issue of potential merit could satisfy the requirement of complete separation from the merits.

### 3. Application of the Test of "Complete Separation"

To apply the element of complete separation, we must evaluate the pertinent issue based on the entire class of orders (*Rhines* stays) rather than the particular arguments in this appeal. *United States v. Bolden*, 353 F.3d 870, 876 (10th Cir. 2003).[5] We thus consider whether the issues underlying a *Rhines* stay are, "as a whole," completely separate from the merits. *Id.*

The Supreme Court has repeatedly cautioned that the collateral-order doctrine requires "complete separation" from the merits. *E.g.*, *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1708 n.3 (2017); *Will v. Hallock*, 546 U.S. 345, 349 (2006); *Sell v. United States*, 539 U.S. 166, 176 (2003); *Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 205 (1999); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996); *Johnson v. Jones*, 515 U.S. 304, 310–11 (1995); *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994); *Richardson-Merrell, Inc. v. Koller*,

---

[5]     In *Bolden*, we considered whether the collateral-order doctrine applied to orders disqualifying an entire U.S. Attorney's office from representing the government. 353 F.3d at 873. The defendant contended that the element of separation wasn't satisfied because the issue of disqualification was entangled in the merits of his claims. *Id.* at 876. We rejected this approach, reasoning that the Supreme Court "'has consistently eschewed a case-by-case approach to deciding whether an order is sufficiently collateral.'" *Id.* (quoting *Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 206 (1999)). We ultimately decided the issue of separation "on the whole of such [disqualification] orders" without determining whether the particular issues in that case had been separate from the merits. *Id.*

11

472 U.S. 424, 431 (1985); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468–69 (1978).

> **4.    Utah's Focus on its Own Arguments (Rather than the Class of Orders)**

Utah also points to its arguments involving good cause, insisting that they do not relate to the merits. And the dissent relies on Utah's arguments involving timeliness, dilatoriness, and procedural default. The focus of Utah and the dissent on Utah's particular appeal points is misguided, as it disregards

- the overlap between Utah's appellate arguments and the merits and

- the need to consider separation categorically based on the class of orders rather than the particular issues invoked by the appellant.

> **a.    Utah's Arguments on Good Cause**

Utah tries to justify application of the collateral-order doctrine based on the district court's alleged misidentification and misapplication of the test for good cause. We reject this effort.

> **i.    Misidentifying the Test for Good Cause**

Utah identifies the definition of good cause as an "important" issue. To determine an issue's importance under the collateral-order doctrine, we consider

- whether the issue is "important in a jurisprudential sense"[6] and

- whether the interests that "'would potentially go unprotected without immediate appellate review are significant relative to efficiency interests sought to be advanced by adherence to the final judgment rule.'"[7]

The definition of good cause might be considered jurisprudentially important now because we lack a precedent squarely defining the test for good cause under *Rhines*. Of course, if we were to undertake interlocutory review and define the test, that definition would settle the issue, rendering it jurisprudentially unimportant in the future. *See* 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction & Related Matters* § 3911.5, at 438 (2d ed. 1992) ("Implementation of a serious and unsettled question requirement can easily lead to a situation in which a particular question is suitable for collateral order appeal the first time it is presented, but not thereafter.").

And Utah has not shown an urgency to immediately define the standard for good cause under *Rhines*. Indeed, Utah has offered many alternative arguments for reversal, such as expiration of the limitations period, procedural default, misapplication of the district court's own test for good cause, dilatoriness, and lack of potential merit. Given Utah's

---

[6]    *Marc Dev't, Inc. v. FDIC*, 992 F.2d 1503, 1505 (10th Cir.), *vacated on other grounds*, 12 F.3d 948 (10th Cir. 1993).

[7]    *Pierce v. Blaine*, 467 F.3d 362, 370–71 (3d Cir. 2006) (quoting *In re Ford Motor Co.*, 110 F.3d 954, 959 (3d Cir. 1997)).

alternative arguments, we may not even need to decide the test for good cause if we were to reverse the grant of a *Rhines* stay.

The dissent nonetheless insists that the test for good cause is important because a court in "literally every grant of a *Rhines* stay, not just this particular grant of a *Rhines* stay, must decide what the appropriate standard for determining 'good cause' is." Dissent at 14. We see the issue differently. If the collateral-order doctrine applied, only two possibilities exist:

1. We decide now what the test is for good cause.

2. We do not decide the test now, ruling on other grounds.

Let's consider the first possibility (that we decide the test for good cause in this appeal). Once we define the test, future panels and district courts will be bound by stare decisis to apply that test in all future cases. *United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000). We thus couldn't continue to view the definition of good cause as jurisprudentially significant once we define the test for good cause.

The second possibility is that we avoid defining the test for good cause. This possibility is real because we could reverse a *Rhines* stay based on any of the three prongs. For example, we might reverse the grant of a *Rhines* stay based on dilatoriness or a lack of potential merit rather than

14

address the issue of good cause.[8] But if we don't decide the test for good cause, how could we apply the collateral-order doctrine based on the importance of deciding that test? If we were to do so, we could put ourselves in the odd position of recognizing appellate jurisdiction to decide the test for good cause without actually deciding what the test is.

Given these two possibilities, application of the collateral-order doctrine based on the test for good cause would paradoxically allow every respondent to appeal every grant of a *Rhines* stay based on an issue that we have already decided or, if not, might not even need to decide. This paradox highlights the need to consider the importance of the issues categorically based on the class of orders involved rather than the particular arguments raised in a particular case.[9]

---

[8] Utah and the dissent criticize Mr. Kell for being dilatory, arguing that Mr. Kell waited until 2017 to seek a stay on his unexhausted claims. Because we lack jurisdiction, we have no occasion to address whether Mr. Kell was dilatory. We note, however, that Mr. Kell requested a stay in a reply brief filed in 2014. *See Kell v. Benzon,* No. 2: 07-CV-359, dkt. no. 115 at 50 (D. Utah Jan. 24, 2014) (Pet'r's Reply Br.) ("Mr. Kell asks this Court to stay these proceedings and hold them in abeyance to allow him to return to state court to exhaust those claims."). But as Utah and the dissent point out, he didn't move for a stay on this issue until 2017.

[9] The dissent calls this possibility an "irrelevant rabbit hole," reasoning that "the question is whether the district court's order resolves an issue that is completely separate from the merits." Dissent at 14 n.4. As the dissent elsewhere acknowledges, however, the question must not only be completely separate from the merits but also "important." Dissent at 9–10. Here we are considering the element of importance. Because the presence of an important issue is necessary under the collateral-order

15

### ii. Misapplying the Test for Good Cause

On the merits of the stay, Utah argues that the district court misapplied the test for good cause. Utah's argument shows that application of the good cause test not only overlaps with the merits but would often require consideration of them. For example, petitioners could sometimes raise the same theory for good cause and the merits of a habeas claim. An example is a *Brady* claim. *See Brady v. Maryland*, 373 U.S. 83 (1963). Courts have considered withholding of information as "good cause." *See Doe v. Jones*, 762 F.3d 1174, 1182 (10th Cir. 2014). So when a petitioner asserts a *Brady* claim, the petitioner might rely on the withholding of evidence for both good cause and the merits of the habeas claim. *See, e.g., Wogenstahl v. Mitchell*, 668 F.3d 307, 322 (6th Cir. 2012) (concluding that a habeas petitioner "had good cause for failing to raise the *Brady* issue prior to 2003, because the new information about [a prosecution witness's prior arrest and adjudication of delinquency] was not disclosed until then").

An overlap also exists between the inquiry on good cause and the merits of other habeas claims. For example, the inquiry on good cause may overlap with the merits when a petitioner alleges ineffective assistance of trial counsel. Suppose that a petitioner alleges good cause based on post-

---

doctrine, our inquiry into the importance of the good-cause test is not an "irrelevant rabbit hole."

16

conviction counsel's failure to assert ineffective assistance on the part of trial counsel. This allegation could suffice to avoid a procedural default. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). And Utah argues that the tests for good cause and procedural default are the same. Given this argument, we might find "good cause" based on post-conviction counsel's ineffectiveness for failure to assert trial counsel's ineffectiveness. And once the case ends in district court, we could again face the issue of trial counsel's ineffectiveness as part of our review on the merits.

The Supreme Court addressed this kind of overlap in *Van Cauwenberghe v. Biard*, 486 U.S. 517 (1988), and *Coopers & Lybrand v. Livesay*, 437 U.S. 463 (1978). In *Van Cauwenberghe*, the Court held that the denial of a motion to dismiss under the doctrine of *forum non conveniens* was not separate from the merits because the doctrine involves factors (like the location of the witnesses and evidence) that are enmeshed with the merits. 486 U.S. at 528–29. And in *Coopers & Lybrand*, the Court held that consideration of class certification involved issues intertwined with the merits because class certification involves merits-related matters like the typicality of the claims, the adequacy of a representative, and the presence of common questions of law or fact. 437 U.S. at 469 & n.12. Thus, the Court held that the collateral-order doctrine does not cover denials of class certification. *Id.* at 469. Neither case involved actual

17

consideration of the merits; but in both cases, the issues overlapped with the merits.

Like issues involving *forum non conveniens* and class certification, the issue of good cause will often overlap with a court's preliminary assessment of the merits, preventing application of the collateral-order doctrine. *See Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 205 (1999) (holding that sanctions orders under Fed. R. Civ. P. 37(a) do not fall under the collateral-order doctrine because they "often will be inextricably intertwined with the merits of the action," "[m]uch like the orders at issue in *Van Cauwenberghe* and *Coopers & Lybrand*").

Here, for example, Utah challenges the finding of good cause, arguing that Mr. Kell could have asserted the claim at trial and in a direct appeal. To address this argument, we would need to ask whether Mr. Kell's attorneys should have asserted the claim at trial or in the direct appeal. This inquiry would presumably overlap with Mr. Kell's habeas claims of ineffective assistance of counsel. Thus, resolution of Utah's arguments on good cause could entangle us in the substance of Mr. Kell's underlying habeas claims. In these circumstances, consideration of good cause under *Rhines* is not categorically separate from the merits.[10]

---

[10] The dissent questions our application of the requirement of complete separation, stating that we are avoiding the "obvious" reality that the definition of the standard for good cause is "a purely legal issue that has

18

## b. Timeliness, Dilatoriness, and Procedural Default

In this appeal, Utah also argues that (1) Mr. Kell was dilatory and (2) his unexhausted claim is untimely and procedurally defaulted. Utah does not suggest that these arguments would support collateral-order jurisdiction. But the dissent does, stating that timeliness, dilatoriness, and procedural default are separate from the merits.

For the sake of argument, let's assume that the dissent is right and ignore the fact that Utah (the appellant invoking appellate jurisdiction) didn't present these arguments as grounds to invoke the collateral-order doctrine. *See* pp. 35–36, below (citing cases for the unavailability of sua sponte arguments to support jurisdiction). As Utah argues, however, the separate issue must also be considered important in order to trigger this

---

*no* overlap with the merits of the case." Dissent at 14 (emphasis in original). The dissent bases its disagreement on footnote ten in *Mitchell v. Forsyth*, 472 U.S. 511 (1984). Dissent at 14. But this footnote explains that an issue is not considered "completely separate" from the merits when its effect "may depend . . . on the success of the parties in litigating the *other legal and factual issues* that form their underlying dispute." *Mitchell*, 472 U.S. at 529–30 n.10 (emphasis added).

The Supreme Court illustrated this point with a disqualification order. *Id.* The disqualification order failed this requirement of "complete separation" because it was "not a legal issue that [could] be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Id.*

Under *Mitchell*'s footnote ten, misapplication of *Rhines*'s requirement of good cause could not satisfy the "complete separation" requirement unless the issue were categorically separate from the merits of any of the habeas claims.

19

doctrine. *See* p. 5, above. Neither Utah nor the dissent offers any argument about the importance of Utah's arguments on timeliness, dilatoriness, or procedural default. These arguments involve garden-variety application of legal principles settled long ago. *See U.S. Fidelity & Guaranty Co. v. Arch Ins. Co.*, 578 F.3d 45, 59 (1st Cir. 2009) (concluding that an issue involving insufficiency of an affidavit was not "important enough . . . to justify the application of the collateral order doctrine"); *United States v. Billmyer*, 57 F.3d 31, 35 (1st Cir. 1995) ("Ordinarily, a discovery order will meet the legal-importance test only if it presents a claim of clear-cut legal error and not merely a challenge to the district judge's factual determinations or the application of settled legal rule to the particular facts."). Thus, Utah's arguments on timeliness, dilatoriness, and procedural default would not constitute important issues, as required to trigger the collateral-order doctrine.

### c. The Categorical Approach

Perhaps in some appeals of *Rhines* stays, the specific argument being advanced might not involve the potential merit of an unexhausted claim. But the Supreme Court has "consistently eschewed a case-by-case approach to deciding whether an order is sufficiently collateral." *Cunningham v.*

*Hamilton Cty., Ohio*, 527 U.S. 198, 206 (1999); *see also* p. 11 & n.5 (discussing *United States v. Bolden*, 353 F.3d 870, 876 (10th Cir. 2003)).

The wisdom of the Supreme Court's approach is self-evident. For example, let's assume that Utah's appellate arguments are important and completely separate from the merits. If we were to base the collateral-order doctrine solely on the happenstance of what Utah argues in a given case, we would be allowing or disallowing interlocutory appeals of all *Rhines* stays based on what a single party has chosen to argue in a single case. To avoid this anomaly, the Supreme Court has required us to consider the underlying class of orders rather than the peculiarities of the arguments presented by this particular appellant. *See* p. 11, above. So here we consider the entire category of orders. *See id.*

The dissent apparently agrees, stating that we must "look[] to the issues the class of orders (*Rhines* stays) generally raise." Dissent at 12. And the dissent acknowledges that we are not to focus on "case-specific issues," such as the issues presented in this particular order granting a *Rhines* stay. *Id.*

With this acknowledgment, the dissent contends that the appellant must present "at least one *issue*" that is "completely separate from the merits." *Id.* at 10 (emphasis in original). But the Supreme Court has consistently rejected this approach, holding that even if some appeals of *Rhines* stays might involve appellate issues separable from the merits, the

21

collateral-order doctrine cannot apply absent complete separation for the *entire* class of orders. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 439 (1985);[11] *see also Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 206 (1999) ("Perhaps not every discovery sanction will be inextricably intertwined with the merits, but we have consistently eschewed a case-by-case approach to deciding whether an order is collateral."). So when we assess whether the class of orders entails complete separation from the merits, we consider the issues in all grants of stays under *Rhines*. The presence of a single issue separate from the merits in a particular appeal would not trigger the collateral-order doctrine. *See Cunningham*, 527 U.S. at 205–06 (holding that sanctions orders under Fed. R. Civ. P. 37(a) are categorically considered intertwined with the merits even though sanctions orders are sometimes separate from the merits); *Koller*, 472 U.S. at 439–40

---

[11] The *Koller* Court explained:

> This Court . . . has expressly rejected efforts to reduce the finality requirement of [28 U.S.C.] § 1291 to a case-by-case determination of whether a particular ruling should be subject to appeal. Even if some orders disqualifying counsel are separable from the merits of the litigation, many are not. Orders disqualifying attorneys on the ground that they should testify at trial, for example, are inextricable from the merits because they involve an assessment of the likely course of the trial and the effect of the attorney's testimony on the judgment. Appellate review of orders disqualifying counsel for misconduct may be entwined with the merits of the litigation as well.

472 U.S. at 439 (citations omitted).

22

(holding that orders disqualifying counsel in civil cases are categorically considered intertwined with the merits because many are even though some aren't); *see also In re Continental Investment Corp.*, 637 F.2d 1, 6 (1st Cir. 1980) (holding "that denials of disqualification motions as a class raise significant legal questions too rarely to bring them within the Cohen exception").

The categorical approach is apparent in the Supreme Court's handling of qualified immunity. There the Court has held that legal issues involving a clearly established violation are completely separate from the merits. *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985). But the Supreme Court made that determination by considering the issues arising in the entire class of orders rather than in the particular case being reviewed. *See id.* at 524–30.

The Supreme Court later went further, expressly disavowing a case-by-case approach in *Johnson vs. Jones*, 515 U.S. 304 (1995). There the Court refused to extend the collateral-order doctrine to cover denials of qualified immunity based on insufficiency of the evidence. *Johnson*, 515 U.S. at 314–15. The Court explained that under the categorical approach, appellate judges could not consider the particular facts to determine the applicability of the collateral-order doctrine. *Id.* at 315. Instead, judges were to consider the kinds of issues likely to arise in appeals involving this class of orders. *Id.* at 315–17. For example, the Supreme Court

23

acknowledged that the facts in *Johnson* itself were straightforward, but stressed that many cases involving constitutional torts would entail factual disputes ill-suited for review under the collateral-order doctrine. *Id.* at 316.

Beyond qualified immunity, circuit courts have followed the Supreme Court's lead by deciding the element of complete separation based on the class of orders involved rather than approaching this element based on the particular issues raised by a particular appellant. *See Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 173 (5th Cir. 2009) ("Consistent with Supreme Court precedent and the general purposes of the final judgment rule, we determine whether an order is appealable as a general or categorical matter."); *see also In re Carco Electronics*, 536 F.3d 211, 213 (3d Cir. 2008) ("[T]he Supreme Court's statement in *Cunningham* that we should not apply the collateral order doctrine on a 'case-by-case' basis indicates that we should not attempt to carve out individualized, case-specific exceptions to the general rule that discovery orders are not immediately appealable."); *Abelesz v. OTP Bank*, 692 F.3d 638, 649 (7th Cir. 2012) ("The Supreme Court has applied the collateral order rule categorically, treating different sorts of defenses or issues as either covered or not covered.").

\* \* \*

Viewed as a category, interlocutory appeals of *Rhines* stays would generally enmesh us in the merits. Thus, the collateral-order doctrine's second element is not met when the district court grants a *Rhines* stay.

B.   **The grant of a *Rhines* stay can be reviewed in the appeal from a final judgment.**

Utah fails to satisfy not only the collateral-order doctrine's second element but also the third element.

Under this element, appellate jurisdiction exists only if the issue is important and could not otherwise be effectively reviewed after the entry of final judgment. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). But we do not just consider unreviewability; we also consider the importance of the interest lost by deferring review until after the final judgment. *See Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 878–79 (1994). This inquiry entails "a judgment about the value of the interests that would be lost through rigorous application of the final judgment requirement." *Id.* On this element, Utah hasn't satisfied its burden.

Utah argues that the grant of a *Rhines* stay is unreviewable after a final judgment because (1) the loss of time can never be remedied and (2) the grant of a stay becomes moot upon entry of a final judgment. We reject both arguments.

As Utah points out, the delay itself is unreviewable because a court can't restore Utah's lost time. But we do not ordinarily regard the loss of

time as sufficiently important to trigger the collateral-order doctrine. *See United States v. Section 17 Tp. 23 North, Range 22 East of IBM, Delaware Cty., Okla.*, 40 F.3d 320, 322 (10th Cir. 1994) (holding that an interest in defending a forfeiture action now, as opposed to later, "is not the type of 'important' right which the Supreme Court contemplated as requiring immediate review in [*Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994)]"). After all, no pretrial decision can ever restore a party's lost time, and we routinely disallow interlocutory appeals for most pretrial decisions. *See Mesa Oil, Inc. v. United States*, 467 F.3d 1252, 1255 (10th Cir. 2006) ("The costs of unnecessary litigation caused by what eventually turns out to be an error by the district court is insufficient to warrant an interlocutory appeal."); *see also In re Kozeny*, 236 F.3d 615, 619–20 (10th Cir. 2000) (two-judge motions panel)[12] ("If the stay merely delays the federal litigation, courts have generally held the stay orders not to be appealable."); *accord Kershaw v. Shalala*, 9 F.3d 11, 14 (5th Cir. 1993) ("Absent a *Moses Cone* situation, stay orders . . . are usually not

---

[12]    Because *Kozeny* was issued by a two-judge motions panel, we would ordinarily discount the opinion's precedential value. *Crystal Clear Comm'ns, Inc. v. Sw. Bell Tel. Co.*, 415 F.3d 1171, 1176 n.3 (10th Cir. 2005). Here, however, we are not relying on *Kozeny* for its precedential value. We are instead relying only on the opinion's observation about our general practice in regarding stay orders as unappealable.

reviewable as collateral orders.");[13] *see also* Hon. Edith H. Jones, *Appeals of Arbitration Orders—Coming Out of the Serbonian Bog*, 31 S. Tex. L. Rev. 361, 372 (1990) ("Absent exceptional circumstances, it is unlikely that an order granting a motion to stay proceedings should be appealable as a collateral order.").

Time is a precious commodity in habeas proceedings, particularly when the petitioner faces a death sentence (as Mr. Kell does). And until now, the case has lingered in state and federal courts for roughly a quarter of a century. But we cannot single out particular cases to decide the extent of the interest lost by deferring review. Instead, we must consider the public interest based on the class of orders (*Rhines* stays). *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009);[14] *In re Motor Fuel*

---

[13]    In *Kershaw*, the Fifth Circuit observed that in *Moses Cone*, the Supreme Court had regarded a stay as final when its purpose and effect were to surrender jurisdiction of a federal suit to a state court. *Kershaw*, 9 F.3d at 14 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 11 n.11 (1983)). This case does not involve surrender of jurisdiction over a federal suit. Instead, the district court required Mr. Kell to exhaust state-court remedies so that the federal court could consider the habeas claim.

[14]    In *Mohawk Industries*, the Supreme Court explained:

[T]he decisive consideration is whether delaying review until the entry of final judgment "would imperil a substantial public interest" or "some particular value of higher order."

In making this determination, we do not engage in an "individualized jurisdictional inquiry." Rather, our focus is on

*Temperature Sales Practices Litig.*, 641 F.3d 470, 482 (10th Cir. 2011) ("When analyzing the third *Cohen* requirement, we do not consider whether the circumstances of the particular case before us warrant our immediate review; rather, we examine whether the entire category of rulings to which the claim belongs can be adequately vindicated on review of a final judgment or by other means."). This approach requires us to decide whether the value that we place on immediate review would override Congress's policy against piecemeal review.

To answer, we must consider the many important interests that exist, often in tension with one another. For example, the state has important interests in comity and enforcement of its own criminal judgments, which Congress recognized in the Antiterrorism and Effective Death Penalty Act of 1996. *See Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that the Act was designed to advance "comity, finality, and federalism"). But habeas review inherently creates tension with comity, as federal courts review decisions by a state's highest court. *See Duckworth v. Eagan*, 492

---

"the entire category to which the claim belongs." As long as the class of claims, taken as a whole, can be adequately vindicated by other means, "the chance that the litigation at hand might be speeded, or a 'particular injustic[e]' averted," does not provide a basis for jurisdiction under § 1291.

*Mohawk Indus.*, 558 U.S. at 107 (citations omitted).

U.S. 195, 211 (1989) (discussing the tension of federal-state relations because of habeas review, where "lower federal courts often sit in 'review' of the judgments of the highest courts of a state judicial system").

To ease this tension, Congress has required habeas petitioners to exhaust state-court remedies. 28 U.S.C. § 2254(b)(1)(A); *see also Rose v. Lundy*, 455 U.S. 509, 518 (1982) ("The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings."). Exhaustion, however, can slow the state's ability to enforce criminal judgments, especially those involving capital sentences. *See* Ira P. Robbins, *Toward a More Just & Effective System of Review in State Death Penalty Cases*, 40 Am. U. L. Rev. 1, 131 (1990) ("[R]equiring exhaustion [in habeas review of death-penalty cases] usually necessitates further delay, even if the unexhausted claim is an obviously frivolous one."). This risk is particularly significant in habeas proceedings, where swift action is essential. *See Rhodes v. Hannigan*, 12 F.3d 989, 992 (10th Cir. 1993) ("Habeas corpus 'is a speedy remedy, entitled by statute to special, preferential consideration to insure expeditious hearing and determination.'" (quoting *Van Buskirk v. Wilkinson*, 216 F.2d 735, 737–38 (9th Cir. 1954))); *Johnson v. Rogers*, 917 F.2d 1283, 1284 (10th Cir. 1990) ("[W]rits of habeas corpus are intended to afford a 'swift and imperative

29

remedy in all cases of illegal restraint or confinement.'" (quoting *Fay v. Noia*, 372 U.S. 391, 400 (1963))).

The Supreme Court sought to balance these competing interests in *Rhines* by giving discretion to federal district courts to stay habeas proceedings while a petitioner exhausts state-court remedies. *Rhines v. Weber*, 544 U.S. 269, 276–78 (2005). But discretion can be abused. The question presented here is when an appellate court should review the district court's exercise of discretion.[15] Given the conflicting interests, we must consider whether interlocutory review of *Rhines* stays would speed review or slow it through piecemeal review.

For this inquiry, we start with Congress's policy against piecemeal review. In general, Congress has tried to avoid piecemeal review by confining appellate review to final orders. *See Abney v. United States*, 431 U.S. 651, 656 (1977) ("[T]here has been a firm congressional policy against interlocutory or 'piecemeal' appeals and courts have consistently

---

[15]    Other circuit courts have generally declined to apply the collateral-order doctrine to orders subject to the abuse-of-discretion standard. *See Grace v. Vannoy*, 826 F.3d 813, 820 (5th Cir. 2016) ("Typically, orders reviewable for abuse of discretion are not appealable under the collateral-order doctrine."); *In re Kemble*, 776 F.2d 802, 806 (9th Cir. 1985) ("Ordinarily we should not use the collateral order doctrine to examine the exercise of discretion by trial judges."). One leading treatise attributed this "wise" practice to a reluctance to undertake interlocutory review when appellate courts have allowed district courts to exercise discretion. 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction & Related Matters*, § 3911.5, at 433–35 (2d ed. 1992).

30

given effect to that policy."). And Congress has expressed its judgment "that the *district judge* has the primary responsibility to police the prejudgment tactics of litigants," reasoning "that the district judge can better exercise that responsibility if the appellate courts do not repeatedly intervene to second-guess prejudgment rulings." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985) (emphasis in original).

The Supreme Court has respected this congressional policy choice and restricted prejudgment review because it inefficiently fosters piecemeal appeals. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) ("Permitting piecemeal, prejudgment appeals, we have recognized, undermines 'efficient judicial administration' and encroaches upon the prerogatives of district court judges, who play a 'special role' in managing ongoing litigation."); *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424. 430 (1985) (stating that the final judgment rule prevents delays from frequent appellate interruptions in the litigation); *Abney*, 431 U.S. at 657 (stating that 28 U.S.C. § 1291, which restricts appellate review to final decisions, is designed to prevent delays and disruptions through intermediate appeals).

Given Congress's preference against interlocutory review, we must consider whether *Rhines* stays involve aberrant circumstances justifying our intrusion into Congress's effort to avoid piecemeal review. We think

31

not. In *Rhines* itself, the Supreme Court balanced the compelling interests by devising a procedure to accommodate

- the state's interest in comity,

- the congressional requirement of exhaustion of state-court remedies,

- the congressional determination that piecemeal review generally slows the litigation,

- the universal recognition that habeas cases should proceed expeditiously, and

- the congressional objective in the Antiterrorism and Effective Death Penalty Act to streamline habeas proceedings.

*Rhines v. Weber*, 544 U.S. 269, 276–78 (2005); *see Howard v. Norris*, 616 F.3d 799, 802–03 (8th Cir. 2010) (stating that "*Rhines* effectively balances the state's interest in avoiding delay in a habeas proceeding, with the petitioner's (and the state's) interest in having habeas claims addressed first in state court"); *see also Grace v. Vannoy*, 826 F3d 813, 819 (5th Cir. 2016) (stating that in *Rhines*, "the Supreme Court implicitly de-emphasized the importance of the state's interests in finality and speedy resolution of mixed federal petitions").

If we were to intervene after a district court granted a stay, would our intervention quicken or slow the litigation? Here, the district court stayed the proceedings for only a single claim and stated that the proceedings would continue on all of the other habeas claims. If we were

to interject ourselves now, we could inadvertently trigger simultaneous litigation of the same case in three courts:

1.      the state district court or the state appellate court,

2.      the federal district court, and

3.      our court.

We question the efficiency of duplicative litigation in three courts. *See Swanson v. DeSantis*, 606 F.3d 829, 833 (6th Cir. 2010) ("Claim-by-claim litigation in the district *and* appellate courts 'undermines [Congress'] goal of streamlining federal habeas proceedings . . . .'" (emphasis and alteration in original) (quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005))).

But double or triple litigation tracks could create not only inefficiency but also more delay. For example, if we were to affirm the grant of a stay, we could be needlessly slowing the habeas litigation for the time that we take to decide the appeal. And, of course, district courts aren't limited to the number of *Rhines* stays in a single case. Here, for example, the district court has issued two *Rhines* stays. If those stays had triggered the collateral-order doctrine, we could have slowed the litigation twice already with the possibility of a third delay when the case ends in district court. In these circumstances, we decline to single out *Rhines* stays

as a class of orders that would be resolved more quickly by authorizing piecemeal appeals.[16]

Our dissenting colleague disagrees, stating that this is not the relevant question. Dissent at 21. But we are simply addressing the arguments presented by Utah and our dissenting colleague. Both argue that interlocutory review is essential to prevent delays in enforcing the State's criminal judgment. Indeed, while challenging our characterization of the question, the dissent insists that "[t]he delay—which is, in itself, a win for Petitioner—is exactly what harms the State's interest." *Id.* at 21. In short, the arguments by Utah and our dissenting colleague require us to consider whether piecemeal review would truly promote the State's interest in expeditious enforcement of its criminal judgments or cause more delay.

---

[16]    Utah contends that these stays have "become the norm" for Utah's death row inmates. In fact, as Utah points out, seven Utah inmates on death row (including Mr. Kell) have requested *Rhines* stays. The district court denied two of these requests. *Honie v. Benzon*, No. 2:07-cv-628 JAR, dkt. no. 120 (D. Utah. Dec. 13, 2017); *Lafferty v. Benzon*, No. 2:07-cv-322 DB, dkt. no. 379 (D. Utah Oct. 30, 2015). And in a third case, the respondent did not object to a *Rhines* stay. *Carter v. Benzon*, No. 2:02-cv-326 TS, dkt. nos. 567, 576 (D. Utah Mar. 1, 2016). We thus know only that a slight majority of capital defendants in Utah have obtained *Rhines* stays over an objection. *Archuleta v. Benzon*, No. 2: 07-cv-630 TC, dkt. no. 107 (D. Utah Nov. 12, 2014); *Kell v. Benzon,* No. 2: 07-cv-359, dkt. nos. 51, 258 (D. Utah Oct. 8, 2009, Nov. 16, 2017); *Taylor v. Benzon*, No. 2: 07-cv-194 TC, dkt no. 45 (D. Utah Feb. 14, 2008); *Menzies v. Benzon*, No. 2:03-cv-902 TC, dkt. nos. 41, 47 (D. Utah Oct. 27, 2004, May 5, 2005).

34

Utah and the dissent also argue that waiting for a final judgment might prevent any appeal of an order granting a *Rhines* stay.[17] They apparently assume that *Rhines* stays will always become moot even when they ultimately lead to a grant of habeas relief. But neither Utah nor the dissent says why a *Rhines* stay would always become moot with a grant of habeas relief.[18] *See Thompson v. Frank*, 599 F.3d 1088, 1090 (9th Cir. 2010) (declining to apply the collateral-order doctrine to a *Rhines* stay because it would be reviewable after the final judgment). And we don't ordinarily construct arguments in support of appellate jurisdiction. *See United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 n.2 (10th Cir. 1996) ("Our duty to consider unargued *obstacles* to subject matter jurisdiction does not affect our discretion to decline to consider waived arguments that might have *supported* such jurisdiction."

---

[17]    Rather than await a final judgment, the government could have sought a writ of mandamus. *See Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 288 n.13 (1988) ("Issuance of a writ of mandamus will be appropriate in exceptional cases involving stay orders."); *In re Kozeny*, 236 F.3d 615, 619–20 (10th Cir. 2000) (two-judge motions panel) (concluding that review of a stay order was properly before the Court of Appeals on a petition for mandamus).

[18]    Utah devoted a single sentence to this issue, writing (with no explanation) that "[t]he grant of a *Rhines* stay will always be moot and unreviewable on plenary appeal." Appellant's Opening Br. at 6. In response, Mr. Kell argued that if the district court grants relief on the stayed claim, the Court of Appeals could reverse the entry of a *Rhines* stay and find the claim unexhausted. Appellee's Response Br. at 6. Utah failed to respond to this argument in its reply brief.

35

(emphasis in original)); *see also Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir. 2011) (Gorsuch, J.) ("It is the appellant's burden, not ours, to conjure up possible theories to invoke our legal authority to hear her appeal."). Given our reluctance to construct arguments for appellate jurisdiction, we cannot assume—as Utah and the dissent do—that review of a *Rhines* stay would become moot if Mr. Kell were to obtain habeas relief.

Even if review of the grant of a *Rhines* stay would eventually become moot, however, the final judgment would certainly be appealable. *See Alexander v. U.S. Parole Comm'n*, 514 F.3d 1083, 1097 (10th Cir. 2008) (stating that a conditional writ of habeas corpus is final, creating appellate jurisdiction); *Burton v. Johnson*, 975 F.2d 690, 693-94 (10th Cir. 1993) (stating that a conditional writ of habeas corpus was an appealable final judgment). Because the district court's ultimate rulings on the habeas claims would be reviewable after the final judgment, the collateral-order doctrine's third element would remain unsatisfied even if the grant of a *Rhines* stay were to become moot. *See Bean v. Dormire*, 10 F.3d 538, 539 (8th Cir. 1993) (per curiam) (holding that the third element of the collateral-order doctrine is unsatisfied in a case involving the stay of a prisoner's § 1983 action because the prisoner's underlying claims would be reviewable later even if the stay itself were otherwise unreviewable). The only difference is that waiting for a final judgment would postpone the

36

appeal. But as discussed above, the delay results from a congressional policy choice. *See* pp. 28–34, above.

* * *

The issues in *Rhines* stays are not categorically separate from the merits and can be effectively reviewed in an appeal from a final judgment. So two of the three elements of the collateral-order doctrine are absent, precluding appellate jurisdiction.

C. **The Supreme Court's consideration of the merits in *Rhines* does not support jurisdiction here.**

Finally, Utah contends that appellate jurisdiction is supported by the Supreme Court's decision in *Rhines* to reach the merits. This contention is based on two steps:

1. *Rhines v. Weber* was appealed to the Eighth Circuit as a collateral order. *See Rhines v. Weber*, 346 F.3d 799, 800 (8th Cir. 2003) (per curiam).

2. If the Eighth Circuit had lacked jurisdiction in *Rhines*, the Supreme Court would not have reached the merits.

We reject this contention.

In *Rhines*, appellate jurisdiction was not mentioned in any of the briefs or in the Supreme Court's opinion. And "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Ariz. Christian School Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

37

But it wouldn't matter here even if the Supreme Court had implicitly blessed application of the collateral-order doctrine in *Rhines*. Before *Rhines* was appealed to the Eighth Circuit, that court's opinion in *Carmichael v. White* had allowed stays of mixed habeas petitions only in "truly exceptional circumstances." *Carmichael v. White*, 163 F.3d 1044, 1045 (8th Cir. 1998). So when *Rhines* was appealed to the Eighth Circuit, the court applied the test that had been used in *Carmichael*. *See Rhines v. Weber*, 346 F.3d 799, 800 (8th Cir. 2003) (per curiam) (citing *Carmichael*, 163 F.3d at 1045).

When *Rhines* later went to the Supreme Court, the parties disagreed over the validity of the Eighth Circuit's test and the extent of a district court's authority to stay, consider, or dismiss mixed habeas petitions. *See Rhines v. Weber*, 544 U.S. 269, 273 (2005). The Supreme Court resolved this disagreement in *Rhines* by creating a new test for stays when some of the habeas claims are unexhausted. *See id.* at 277–78.

Given the Supreme Court's creation of a new test in *Rhines*, our consideration of Utah's appeal would entail

- the application of the *Rhines* factors rather than the previous Eighth Circuit test and

- the appropriateness of a stay rather than the district court's authority to stay, consider, or dismiss mixed habeas petitions.

These issues did not exist when *Rhines* was appealed to the Eighth Circuit. So even if the Supreme Court had silently concluded that the collateral-

38

order doctrine applies to stays granted under the test in *Carmichael*, that conclusion would not apply to an appeal addressing the appropriateness of a stay based on the *Rhines* factors. *See Howard v. Norris*, 616 F.3d 799, 802–03 (8th Cir. 2010) (noting that the Eighth Circuit's pre-*Rhines* rationale for applying the collateral-order doctrine to stays of habeas proceedings was "no longer applicable"). As a result, *Rhines*'s procedural posture supplies no meaningful guidance on our jurisdictional issue.

5.     **Conclusion**

We lack appellate jurisdiction. A *Rhines* stay is not a final decision, and two elements of the collateral-order doctrine are not met. This doctrine applies only when the order conclusively decides an important question, separate from the merits, that would be effectively unreviewable in a direct appeal from a final judgment. But when *Rhines* stays are viewed categorically, the issues are generally inseparable from the merits and reviewable after entry of the final judgment. We thus lack appellate jurisdiction and dismiss the appeal.

17-4191, *Kell v. Benzon*

**BALDOCK**, Circuit Judge, dissenting:

Today, this Court holds we do not have appellate jurisdiction over grants of *Rhines* stays in capital cases. In so holding, the Court fails to see the forest for the trees. Despite the Supreme Court's repeated admonitions that we should give 28 U.S.C. § 1291 a "practical" rather than a "technical" construction, the Court takes an overly technical view of § 1291 by neglecting to put the grant of a *Rhines* stay in the proper context of AEDPA and the policy behind enforcing a stringent final judgment rule. The Court further ignores salient Supreme Court precedent about the collateral order doctrine and severely understates a state's important interest in executing its sentence of death without delay— in this case, against Petitioner Troy Kell, who brutally murdered a fellow inmate *almost twenty-five years ago*. For these reasons, I cannot join the Court's opinion.

I.

The Court's opinion brings to mind the 1989 Report of the Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, which was formed by Chief Justice Rehnquist and chaired by Justice Powell. Judicial Conference of the U.S., Ad Hoc Comm. on Fed. Habeas Corpus in Capital Cases, Comm. Report and Proposal (Aug. 23, 1989) [hereinafter Powell Comm. Report]. The Committee determined federal habeas law "has led to piecemeal and repetitious litigation, and years of delay between sentencing and a judicial resolution as to whether the sentence was permissible under the law." *Id.* at 1. The Committee specifically noted: "The lack of coordination between the federal and state legal

systems often results in inefficient and unnecessary steps in the course of litigation." *Id.* at 2.

Against this backdrop, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)—the long title of which is "An Act to deter terrorism, provide justice for victims, *provide for an effective death penalty*, and for other purposes." Pub. L. No. 104-132, 110 Stat. 1214 (1996) (emphasis added). In providing for an effective death penalty, AEDPA aims to "reduce delays in the execution of state and federal criminal sentences, particularly in capital cases." *Rhines v. Weber*, 544 U.S. 269, 276 (2005) (citing *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). Toward this end, AEDPA imposes a one-year statute of limitations on the filing of a federal habeas petition. 28 U.S.C. § 2244(d). Another purpose of AEDPA is to promote comity by "encourag[ing] petitioners to seek relief from state courts in the first instance." *Rhines*, 544 U.S. at 276. AEDPA achieves this goal by "tolling the 1-year limitations period while a 'properly filed application for State post-conviction or other collateral review' is pending." *Id.* (citing 28 U.S.C. § 2244(d)(2)).

Prior to the passage of AEDPA, a district court was required to dismiss a federal habeas petition that included both exhausted and unexhausted claims—that is, a "mixed" petition. *Rose v. Lundy*, 455 U.S. 509, 510 (1982). After dismissal, a petitioner could either resubmit the habeas petition with only exhausted claims or exhaust his claims in state court and later file a new petition in federal court. *Id.* The Powell Committee specifically identified this "moving back and forth between the federal and state systems in the process of exhausting state remedies" as one of the aforementioned "inefficient and unnecessary

2

steps in the course of litigation." Powell Comm. Report, *supra* page 1, at 2. After Congress passed AEDPA, *Lundy*'s total exhaustion rule created a problem when petitioners filed mixed petitions in federal court. Because of the new one-year statute of limitations, dismissal of mixed petitions pursuant to *Lundy* likely foreclosed the possibility of federal review. *Rhines*, 544 U.S. at 275. To prevent this result, district courts began staying, instead of dismissing, the federal habeas case to allow the petitioner to exhaust his claims in state court. *Id.* at 276. The district court would then lift the stay after the petitioner exhausted his claims and resume federal proceedings. *Id.* at 276–77.

In *Rhines*, the Supreme Court upheld this stay-and-abeyance procedure but acknowledged "[s]tay and abeyance, if employed too frequently, has the potential to undermine" the purposes of AEDPA. *Id.* at 277. Rather than reducing delays in the execution of a sentence, stay and abeyance "allow[s] a petitioner to delay the resolution of the federal proceedings." *Id.* And rather than encouraging petitioners to first seek relief in state court, stay and abeyance "decreas[es] a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition." *Id.* Stay and abeyance potentially undermines AEDPA's purposes even more in capital cases, for capital petitioners alone have every incentive "to prolong their incarceration and avoid execution of the sentence of death." *Id.* at 277–78; *see also Lundy*, 455 U.S. at 520 ("The [non-capital] prisoner's principal interest, of course, is in obtaining speedy federal relief on his claims."). Thus, the Supreme Court cautioned that stay and abeyance of mixed petitions "should be available only in *limited circumstances*." *Id.* at 277 (emphasis added). Specifically, stay and abeyance is only available if "[1] the petitioner had good cause for his failure to

3

exhaust, [2] his unexhausted claims are potentially meritorious, and [3] there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id.* at 278.

II.

In 1994, Petitioner Troy Kell, a white supremacist incarcerated in state prison, stabbed African-American inmate Lonnie Blackmon sixty-seven times. Petitioner's attack lasted approximately two and a half minutes, during which Petitioner walked away twice only to return again to Blackmon's writhing body to continue to stab him. Blackmon, who was handcuffed and held down by Petitioner's accomplice during the attack, bled to death. The facts of the murder have never been in dispute, as the murder was captured on prison security video. Petitioner proceeded to trial, and in 1996, a jury found Petitioner guilty of aggravated murder and sentenced him to death. In 2002, the Supreme Court of Utah upheld his conviction and sentence on direct appeal. *State v. Kell*, 61 P.3d 1019 (Utah 2002). Petitioner then pursued state post-conviction relief. The post-conviction court dismissed the petition, and the Supreme Court of Utah upheld this dismissal in 2008. *Kell v. State*, 194 P.3d 913 (Utah 2008). In January 2009, Petitioner filed a pro se motion for relief under Utah Rule of Civil Procedure 60(b), alleging ineffective assistance of his appointed post-conviction counsel. Later in 2009, Petitioner, through appointed counsel, filed a federal habeas petition. Shortly thereafter, Petitioner sought and received a *Rhines* stay in his federal case while he pursued his claims in state court. In 2012, Petitioner's state claims were denied. *Kell v. State*, 285 P.3d 1133 (Utah 2012).

Petitioner's federal case resumed after the three-year *Rhines* stay. In 2013, Petitioner filed an amended habeas petition. In this petition filed seventeen years after his

4

conviction, Petitioner raised the new claim that the trial court gave an unconstitutional supplemental jury instruction that shifted the burden of proof onto Petitioner during the penalty phase deliberations. In support, Petitioner attached three juror declarations signed eight months before he filed his amended petition. Two jurors recalled the trial judge speaking to the jury after deliberations began. The other juror recalled, in more specificity, that when the judge spoke to the jurors during deliberations, he said "that [Petitioner's] attorney's [sic] had to show us that [Petitioner's] life should be spared." ROA Vol. IV, 666. Petitioner noted "[t]here are no indications in the trial transcripts of a question from the jury after the beginning of deliberations, either during the guilt or penalty phases." *Id.* Petitioner concluded: "The error that resulted from [the trial judge's] ex parte response which shifted the burden of proof for the entire penalty proceeding away from the State and onto [Petitioner], was a prejudicial error of constitutional magnitude, requiring reversal." *Id.* at 666–67.

*Over four and a half years after filing his amended habeas petition*, Petitioner filed a motion for a second *Rhines* stay so that he could exhaust his supplemental-instruction claim (and another claim not relevant to this appeal) in state court.[1] In November 2017, the district court granted the stay, holding Petitioner satisfied the three *Rhines* elements because (1) there was good cause for not previously exhausting the supplemental-

---

[1] The Court states that Petitioner requested a stay in 2014. Maj. Op. at 15 n.8. Just to be clear, this "request" consisted of one sentence buried in a 208-page reply brief to his petition, which obviously has not been ruled on. ROA Vol. VI, 1278. The fact remains that Petitioner did not file a motion to stay regarding the issue underlying this appeal until 2017—over four and a half years after filing his amended habeas petition.

5

instruction claim; (2) the claim was potentially meritorious; and (3) there was no indication Petitioner engaged in abusive or dilatory tactics. As to good cause, Petitioner argued he did not previously exhaust the supplemental-instruction claim because his post-conviction counsel was ineffective and failed to interview any jurors. In addressing this claim, the district court first explained that neither Supreme Court nor Tenth Circuit precedent has defined "good cause" in the *Rhines* context. As a result, some district courts have held "good cause in the *Rhines* context is akin to good cause to excuse procedural default in federal court," while others have given it a "more expansive and equitable reading." ROA Vol. VII, 1725. Relying on a Ninth Circuit opinion and two District of Utah cases, the district court adopted the latter standard that "good cause for a *Rhines* stay cannot be any more demanding than a showing of cause for procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012), and, in fact, may be less demanding." *Id.* at 1726 (citing *Blake v. Baker*, 745 F.3d 977 (9th Cir. 2014); *Lafferty v. Crowther*, No. 2:07-CV-322, ECF No. 379 (D. Utah Oct. 30, 2015); *Archuleta v. Crowther*, No. 2:07-CV-630, ECF No. 107 (D. Utah Nov. 12, 2014)). After establishing the standard, the court concluded that Petitioner's "post-conviction counsel's deficient performance constitutes cause under *Rhines*." *Id.* at 1727.

Regarding the potential merit of the supplemental-instruction claim, the district court did not consider the State's arguments that the claim would be time-barred or procedurally barred in state court. Invoking notions of "federalism" and "comity," the court held the state courts must "have the opportunity to make those procedural decisions." *Id.* at 1728–29. The court then explained Petitioner's claim and apparently held it was

6

potentially meritorious. The district court's analysis—which, again, purports to be about whether the supplemental-instruction claim was potentially meritorious—reads in full:

> Counsel in [Petitioner's] state habeas proceedings admitted that he was unaware of this issue because he failed to speak with any of the jurors, and that there was no strategic reason for his failure to do so. Because counsel was unaware of the issue, he failed to raise this claim to the state court, meaning that [Petitioner] has been denied the opportunity to have this potentially significant claim reviewed by the state court. Counsel's failure to raise this potentially meritorious claim constitutes good cause under *Rhines*.

*Id.* at 1732 (citation omitted). In other words, the district court concluded Petitioner's claim was potentially meritorious without analyzing whether the claim was potentially meritorious. Instead, the district court looked to Petitioner's counsel's failure to investigate and raise the claim in state court—considerations not at all relevant to whether Petitioner's constitutional rights were potentially violated by an alleged ex parte supplemental jury instruction—and confusingly determined this failure constitutes "good cause," a conclusion the court had already reached in element one.

Lastly, the district court held there was "no indication that [Petitioner] has engaged in intentional or abusive dilatory litigation tactics." *Id.* at 1733. The court reasoned federal proceedings were stayed until 2012, and Petitioner had followed the case management schedule. Rejecting the State's argument that nothing prevented Petitioner from bringing the claim in state court earlier, the court held Petitioner satisfied the third *Rhines* element.

After determining all three elements were satisfied, the district court issued the stay. *Only then* did Petitioner file a petition in state court raising the supplemental-instruction claim. Not surprisingly, the state trial court has since rejected this claim as both time and

7

procedurally barred. The case is now pending before the Supreme Court of Utah. *Kell v. Benzon*, No. 20180788 (appeal docketed Oct. 1, 2018).

In the meantime, the State requested that the district court certify for immediate appeal its grant of a second *Rhines* stay under 28 U.S.C. § 1292(b). The district court denied the State's request because "there is not sufficient basis to find a difference of opinion on which [good cause] standard should apply"—a conclusion that is simply impossible to reconcile with the court's previous order noting district courts have applied different "good cause" standards. Doc. 279, at 4. The State also sought to appeal the stay pursuant to 28 U.S.C. § 1291, arguing (1) the standard for "good cause" under *Rhines* should be the same as "cause" to overcome procedural default and (2) the district court abused its discretion under all three *Rhines* elements in granting the stay. Before we can reach the merits of these arguments, we must of course have jurisdiction to do so. Because this is an interlocutory appeal and the district court oddly enough saw fit to deny the State's request for certification of appeal under § 1292(b), the only potential basis for this Court to exercise jurisdiction is § 1291 by way of the collateral order doctrine.[2]

---

[2] I preface my discussion of the collateral order doctrine by noting *Rhines* itself was appealed to the Eighth Circuit pursuant to the collateral order doctrine. *Rhines v. Weber*, 346 F.3d 799, 800 (8th Cir. 2003) (per curiam) ("We have jurisdiction under the collateral order doctrine to review an interlocutory order holding a habeas petition in abeyance pending exhaustion of state court remedies."), *vacated on other grounds*, 544 U.S. 269 (2005). The Supreme Court granted certiorari in the case and, without mentioning the jurisdictional issue, proceeded to the merits. *Rhines*, 544 U.S. 269. Even more, the Supreme Court remanded the case to the Eighth Circuit to exercise jurisdiction and adjudicate the case in accordance with the Supreme Court's opinion. *Id.* at 279.

Federal courts, including the Supreme Court, "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The Supreme Court

8

III.

This Court has "jurisdiction of appeals from all final decisions of the district courts of the United States[.]" 28 U.S.C. § 1291. Encompassed in section 1291's definition of "final decisions" is "a 'small class' of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). This "small class" includes decisions that "finally determine claims of right separable from, and collateral to, rights asserted in the action, *too important to be denied review* and *too independent of the cause itself* to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (emphasis added). The Supreme Court "has long given [section 1291] this *practical* rather than a technical construction," *id.* (emphasis added), and has emphasized the class of collaterally appealable orders is "narrow and selective in its membership," *Will*, 546 U.S. at 350. As the Court's opinion explains, to fall within this narrow class of decisions, the order must (1) be "conclusive"; (2) "resolve important questions separate from the merits"; and (3) be "effectively unreviewable on appeal from

---

has undertaken this independent obligation and vigilantly guarded the exclusivity of the collateral order doctrine. *See Will v. Hallock*, 546 U.S. 345, 350 (2006) ("[W]e have meant what we have said; although the Court has been asked many times to expand the 'small class' of collaterally appealable orders, we have instead kept it narrow and selective in membership."). In *Will*, for example, after granting certiorari on the merits of an issue, the Supreme Court vacated and remanded to the Court of Appeals to dismiss for lack of jurisdiction because the underlying order was not immediately appealable under the collateral order doctrine. *Id.* at 349. At the same time, as this Court points out, the Supreme Court's prior exercise of jurisdiction and subsequent remand in *Rhines* do not necessarily stand for the proposition that the stay was immediately appealable under the collateral order doctrine. *See Hagans v. Lavine*, 415 U.S. 528, 535 n.5 (1974).

9

the final judgment in the underlying action." *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 41 (1995). As no question exists whether the first element is satisfied, I turn to the second and third elements.[3]

A.

The second collateral order doctrine element requires the order to "resolve important questions separate from the merits." *Swint*, 514 U.S. at 41. This separateness requirement "is a distillation of the principle that there should not be piecemeal review of 'steps towards final judgment in which they will merge.'" *Moses H. Cone*, 460 U.S. at 12 n.13. The Court and I differ on exactly what must be separate in order to satisfy this element. Whereas this Court holds the entire collateral *order* must be completely separate from the merits, I contend that at least one *issue* involved in granting a *Rhines* stay must be completely separate from the merits. This is clearly what the Supreme Court has required. *E.g.*, *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1708 n.3 (2017) (stating the decision must "resolve important *issues* 'completely separate from the merits'" (emphasis added)); *Will*, 546 U.S. at 349 (stating the order must "resolve *an* important *issue* completely separate from the merits of the action" (emphasis added)); *Sell v. United States*, 539 U.S. 166, 176

---

[3] An order is "conclusive" when "nothing in the subsequent course of the proceedings in the district court . . . can alter the court's conclusion." *See Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985). This element is plainly met here. Nothing was tentative about the determination that Petitioner's federal proceedings would halt while Petitioner exhausted his supplemental-instruction claim in state court. A grant of a *Rhines* stay is only subject to revision in the same way every order is subject to revision. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 & n.14 (1983). This indicates "nothing in the subsequent course of the proceedings in the district court . . . can alter the court's conclusion" that Petitioner was entitled to a *Rhines* stay. Accordingly, the district court's grant of a *Rhines* stay is conclusive.

10

(2003) (stating a decision is "appealable as a collateral order when it . . . resolves *an* important *issue* completely separate from the merits of the action" (emphasis added) (brackets and quotations omitted)); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996) (stating the order must "conclusively determine *a* disputed *question* that is completely separate from the merits of the action" (emphasis added) (brackets and quotations omitted)); *Johnson v. Jones*, 515 U.S. 304, 310–11 (1995) (stating the order must "resolve *an* important *issue* completely separate from the merits of the action" (emphasis added)); *Dig. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (stating the decision must "resolve important *questions* completely separate from the merits" (emphasis added)); *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 431 (1985) (stating the order must "resolve *an* important *issue* completely separate from the merits of the action" (emphasis added)); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) (stating "the order must . . . resolve *an* important *issue* completely separate from the merits of the action" (emphasis added)); *Abney v. United States*, 431 U.S. 651, 658 (1977) (stating the decision in *Cohen* "resolved *an issue* completely collateral to the cause of action asserted" (emphasis added)).

Of utmost importance, in each of these cases, "completely separate" modified "issues," "an issue," "a question," and "questions," *not* "an order." Therefore, the only reasonable conclusion to be reached is that there must be "an issue" that is "completely separate" from the merits of the action. Such a conclusion is consistent with the Supreme Court's *explicit rejection* of the argument that there must be no overlap whatsoever between a collateral order and the merits of a claim. *Mitchell*, 472 U.S. at 529 n.10. In

11

*Mitchell*, the Supreme Court explained that if "any factual overlap between a collateral issue and the merits of the plaintiff's claim is fatal to a claim of immediate appealability," then denials of claims of double jeopardy and absolute immunity could not be appealed, for such claims necessarily require an inquiry into a plaintiff's factual allegations. *Id.* But these claims *are* appealable pursuant to the collateral order doctrine. *Nixon v. Fitzgerald*, 457 U.S. 731, 742–43 (1982); *Abney*, 431 U.S. at 662. With this understanding, the Supreme Court held an order denying qualified immunity is immediately appealable. *Mitchell*, 472 U.S. at 530.

The Court today understands this to contravene the requirement that we must view the class of orders as a whole. To be clear, I absolutely agree with the well-settled requirement that we must focus on the class of orders. We cannot focus on the class of orders, however, without looking to the issues the class of orders generally raise. Here, we *must* look to *Rhines*-stay-specific issues. Looking to *Rhines*-stay-specific issues is wholly different than analyzing the issues on a case-by-case basis. At no point in this dissent do I advocate for analyzing case-specific issues—something the Court and I agree is unacceptable. In sum, we must look to issues that orders granting *Rhines* stays generally raise (as opposed to the issues *this* order granting a *Rhines* stay raises); if one or more of these issues is completely separate from the merits, this element is satisfied. From what I understand, the Court thinks we must look to issues that any order granting a *Rhines* stay could hypothetically raise; if any of these issues overlap with the merits, this element is not satisfied. This understanding does not comport with Supreme Court precedent, nor our own. *Mitchell*, 472 U.S. at 529 n.10; *United States v. Bolden*, 353 F.3d 870, 876 (10th Cir.

2003) (assuming without deciding an issue implicated in an order could overlap with the underlying merits but that "on the whole such orders . . . satisfy the separability requirement").

The requirement that there be "an issue" that is "completely separate" from the merits is undoubtedly met in this case. In fact, at least three such issues are involved in granting a *Rhines* stay. The first, which is a purely legal issue, is whether the appropriate standard for "good cause" is akin to "cause" to overcome procedural default or is something less stringent. "Cause" to overcome procedural default requires a petitioner to show "something *external* to the petitioner, something that cannot fairly be attributed to him" or his counsel prevented the petitioner from raising a claim. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). Neither we nor the Supreme Court has applied this definition or otherwise defined "good cause" in the *Rhines* context. In dicta, however, the Supreme Court has stated that "[a] petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court." *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005). This statement could be interpreted as indicating a lesser standard than "cause" to overcome procedural default is appropriate for "good cause" in the *Rhines* context. Accordingly, district courts are divided on what standard to use. *Compare Hernandez v. Sullivan*, 397 F. Supp. 2d 1205, 1207 (C.D. Cal. 2005) ("[T]he Court deems it appropriate to look to procedural default case law for guidance in determining whether Petitioner has demonstrated the requisite 'good cause' for failing to exhaust his unexhausted claims prior to filing this habeas action."), *with Rhines v. Weber*, 408 F. Supp. 2d 844, 849 (D.S.D. 2005) ("[T]his court believes that the

13

Supreme Court suggested a more expansive definition of 'good cause' in *Pace* and *Rhines* than the showing needed for 'cause' to excuse a procedural default."). This issue is critically important because the resolution of the standard could be the deciding factor in many cases.

Unfortunately, the Court today sidesteps the State's purely legal argument about the "good cause" standard and unnecessarily criticizes the State's arguments by noting we must look to categories of cases rather than the particular arguments raised in an individual case. Maj. Op. at 12–15. But literally every grant of a *Rhines* stay, not just this particular grant of a *Rhines* stay, must decide what the appropriate standard for determining "good cause" is.[4] Ultimately, by giving this issue short shrift, the Court avoids acknowledging the obvious: this is a purely legal issue that has *no* overlap with the merits of the case. In other words, this issue is most assuredly "a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Mitchell*, 472 U.S. at 530 n.10.

The second issue that does not overlap with the merits is whether the district court can consider state time and procedural bars in determining whether a claim is "potentially

---

[4] Given a district court must hold "good cause" exists (which requires defining the "good cause" standard) in order to issue a *Rhines* stay, this fact is not up for debate. The Court "see[s] the issue differently" because if the Court proceeded to the merits, we might not reach the "good cause" issue and instead rule on other grounds. Maj. Op. at 14–15. But the question is not whether this Court would necessarily have to rule on the issue. At the risk of sounding like a broken record, the question is whether the district court's order resolves an issue that is completely separate from the merits. *E.g.*, *Will*, 546 U.S. at 349. In discussing whether this Court would have to decide the "good cause" standard, the Court has taken the reader down an irrelevant rabbit hole.

14

meritorious."  In this case, the district court answered in the negative: "[I]n considering whether [Petitioner's] claims are potentially meritorious, this court will not address possible state court time and procedural bars, but will leave the determination of the procedural posture of the claims to the state court."  ROA Vol. VII, 1729.  The district court supported its holding with statements from a district court order, two wholly inapposite out-of-circuit opinions, and one Tenth Circuit opinion that does not address this issue.  *Id.* at 1728–29 (citing *Lafferty v. Crowther*, 2015 WL 6875393 (D. Utah 2015); *Simpson v. Camper*, 927 F.2d 392, 393 (8th Cir. 1991); *Pike v. Guarino*, 492 F.3d 61, 74 (1st Cir. 2007); *Fairchild v. Workman*, 579 F.3d 1134, 1153 (10th Cir. 2009)).  The district court's grasp at non-binding (and unpersuasive) authority to support its position is understandable because, again, neither the Supreme Court nor the Tenth Circuit has weighed in on whether the refusal to address possible state court time and procedural bars is valid.  Like the question of the good cause standard, this purely legal issue is clearly completely separate from the merits of a petitioner's claim.

Additionally, the third *Rhines* element, which requires a court to consider whether the petitioner engaged in intentionally dilatory litigation tactics, does not overlap with the merits.  While this element does not appear to present a purely legal issue, the facts involved are completely separate from the facts involved in a petitioner's unexhausted claim.  At this point, we have three issues, two of which are purely legal, that have *no* overlap with the merits of a petitioner's claim—none whatsoever.  The Court today fails to acknowledge this reality.

The Court instead focuses only on two issues that it asserts overlap with the merits: the application of the "good cause" standard to the facts of the case and whether the claim has "potential merit." This latter issue, which is "a fraction of a fraction" of the total inquiry in issuing a *Rhines* stay, undoubtedly overlaps with the merits. Rep. Br. at 5. The former issue's overlap with the merits, however, is questionable. The Court's assertion that the application of the good cause standard will "often overlap with a court's preliminary assessment of the merits" seems to me to be an exaggeration. Maj. Op. at 18. The Court points to two situations in which this *could* happen: if a petitioner raises a *Brady* claim and if a petitioner raises a different claim of ineffective assistance of counsel. As explained above, I do not understand Supreme Court precedent to require us to engage in a hypothetical inquiry of all possible permutations of claims that could be brought in order to determine whether an order is appealable pursuant to the collateral order doctrine. Accordingly, I remain focused on the issues grants of *Rhines* stays generally raise, rather than every issue a grant of a *Rhines* stay could hypothetically raise.

Even though the district court must consider some factual allegations in a petition before granting a *Rhines* stay (a duty that the district court failed miserably to perform in this case), a grant of a *Rhines* stay undoubtedly "resolve[s] important issues 'completely separate from the merits.'" *Microsoft Corp.*, 137 S. Ct. at 1708 n.3. Accordingly, the second element of the collateral order doctrine is satisfied.[5]

---

[5] In its discussion of the second element, the Court asserts: "if the district court enters multiple *Rhines* stays, we could face three or more appeals with overlapping issues." Maj. Op. at 8. I understand that if *Rhines* stays are appealable and multiple *Rhines* stays are entered, this Court could face three or more appeals. But the Court does not clarify

16

B.

The third collateral order doctrine element requires the order to be "effectively unreviewable on appeal from the final judgment in the underlying action." *Swint*, 514 U.S. at 41. This element, too, is undoubtedly met. At no other point will this Court have the opportunity to decide the important issues at stake in granting a *Rhines* stay. Of course, if the Petitioner obtains relief from the Utah Supreme Court, the *Rhines* stay issues will never again arise in this case because Petitioner will be granted a new state trial. If the Utah Supreme Court denies relief and then the district court denies habeas relief on the previously unexhausted claim, the issues would be moot on appeal. Petitioner posits the State could appeal the *Rhines* stay issues after final judgment if he ultimately obtains habeas relief on the previously unexhausted claim. How can this possibly be? Say, the Petitioner prevails in the district court and the State appeals, arguing among other things that the district court abused its discretion in granting a *Rhines* stay years earlier. Would the district court's grant of a *Rhines* stay not be moot at that point? What relief could the court possibly grant the State if it prevails on that claim? None! That particular controversy is *over*.

---

when these potential "*three or more* appeals" would concern "overlapping issues." Even where a district court issues multiple *Rhines* stays, each *Rhines* stay concerns different claims by a petitioner and therefore different issues. To illustrate, a district court issues a *Rhines* stay on claim *x*, allowing the petitioner to exhaust the claim in state court. After the petitioner exhausts claim *x* in state court and returns to federal court, the district court is not going to issue another *Rhines* stay for the purpose of allowing the petitioner to exhaust claim *x*. If there is a second *Rhines* stay, it would be issued for the petitioner to exhaust claim *y*. If both of these *Rhines* stays are appealed and then the final judgment is appealed, the "same issues" would *not* be before this Court *three or more* times.

17

The Court points out that "the district court's ultimate rulings on the habeas claims would be reviewable after the final judgment." Maj Op. at 38–39. Of course. But that certainly does not mean "the collateral-order doctrine's third element would remain unsatisfied even if the grant of a *Rhines* stay were to become moot." *Id.* at 39. We are not concerned here with whether other issues involved in this case, such as "the district court's ultimate rulings on the habeas claims," would be reviewable on appeal of the final judgment; we are concerned with whether the issues involved in granting a *Rhines* stay are reviewable on appeal of the final judgment.[6]

Even assuming a court has the opportunity to review a district court's issuance of a *Rhines* stay after final judgment—a proposition I vehemently disagree with—we must then look to the importance of the interests at stake. Whether an order is "effectively unreviewable" necessarily requires "a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement." *Mohawk Indus., Inc*, 558 U.S. at 107 (quoting *Dig. Equip. Corp.*, 511 U.S. at 878–79). "That a ruling 'may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final

---

[6] The Court also states Petitioner could have filed a writ of mandamus rather than await final judgment. Maj. Op. at 35 n.17. But a writ of mandamus is not the relief the Supreme Court contemplated in *Rhines*. The standard for issuing a writ of mandamus is higher than the abuse of discretion standard. *In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186–87 (10th Cir. 2009). In fact, we have explicitly stated that "[t]here must be more than what we would typically consider to be an abuse of discretion in order for the writ to issue." *Id.* at 1186. In *Rhines*, however, the Supreme Court stated three times that the standard of review for *Rhines* stays is "abuse of discretion." *Rhines*, 544 U.S. at 277–79. Accordingly, the Supreme Court clearly contemplated *Rhines* stays to be reviewed on direct appeal, rather than through a writ of mandamus.

18

district court judgment . . . has never sufficed.'" *Id.* (quoting *Dig. Equip. Corp.*, 511 U.S. at 872). "Instead, *the decisive consideration* is whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Id.* (quoting *Will*, 546 U.S. at 352–53) (emphasis added). The certain "high order" values the Supreme Court has accepted as being important enough to not delay review until the entry of final judgment include: "honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interests, and mitigating the government's advantage over the individual." *Will*, 546 U.S. at 352–53.

The "decisive" question, then, is just this: does delaying review of the *Rhines* stay until after a petitioner exhausts his claims in state court and returns to federal court "imperil a substantial public interest" or "some particular value of a high order"? *See Mohawk Indus., Inc.*, 558 U.S. at 107. The answer is a resounding yes. The "substantial public interest" or "value of a high order" at issue when a *Rhines* stay is granted is a state's right to enforce its criminal judgments, particularly in capital cases. "Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them." *McClesky v. Zant*, 499 U.S. 467, 491 (1991). In fact, the Supreme Court has held a state's "sovereign power to enforce the criminal law" is an interest of "great weight." *In re Blodgett*, 502 U.S. 236, 239 (1992) (per curiam). States suffer "severe prejudice" when they are prevented from exercising this power. *Id.* (holding Washington "sustained severe prejudice by [a] 2½-year stay of execution"). In particular, "the criminal law is deprived

19

of much of its deterrent effect." *Teague v. Lane*, 489 U.S. 288, 309 (1989); *see also McClesky*, 499 U.S. at 491 (discussing the need for finality in criminal cases). Further, the state loses legitimacy, as "[t]he resulting lack of finality undermines public confidence in our criminal justice system." Powell Comm. Report, *supra* page 1, at 1.

Not only has the Supreme Court put "great weight" on a state's power to enforce its criminal law, Congress has also prioritized this power with the passage of AEDPA. One of the driving forces in passing AEDPA was to "reduce delays in the execution of state and federal criminal sentences, *particularly in capital cases*." *Rhines*, 544 U.S. at 276 (emphasis added). AEDPA has no teeth if federal habeas law still leads "to piecemeal and repetitious litigation, and years of delay between sentencing and a judicial resolution as to whether the sentence was permissible under law," as it has in this case and potentially many others. Powell Comm. Report, *supra* page 1, at 1. Supreme Court precedent and AEDPA indicate a state's ability to enforce its criminal judgments without delay is a "substantial public interest" or "value of a high order" that ranks among "honoring the separation of powers, preserving the efficiency of government and the initiative of its officials, respecting a State's dignitary interests, and mitigating the government's advantage over the individual." *Will*, 546 U.S. at 352–53.

The Court today does not dispute the importance of the issues at stake. Indeed, this would be difficult to do in light of the fact that this Court has previously held an appeal concerning an anti-SLAPP statute, which aims to "nip harassing litigation in the bud," was too important to be denied review until entry after final judgment. *Los Lobos Renewable Power, LLC v. Americulture, LLC*, 885 F.3d 659, 666–67 (10th Cir. 2018). Instead, the

20

Court focuses on "whether interlocutory review of *Rhines* stays would speed review or slow it through piecemeal review." Maj. Op. at 30. This is not the question under the third element of the collateral order doctrine.[7] Again, the "decisive" question is whether delaying review of the *Rhines* stay until after a petitioner exhausts his claims in state court and returns to federal court "imperil a substantial public interest" or "some particular value of a high order." *See Mohawk Indus., Inc.*, 558 U.S. at 107.

Let us not forget: Petitioner stabbed Blackmon to death almost twenty-five years ago; he was sentenced to death over twenty-two years ago; his direct appeals ended over sixteen years ago; his state post-conviction proceedings ended over ten years ago; his federal habeas petition was filed nearly ten years ago; he received his first *Rhines* stay, which lasted three years, over nine years ago; and his amended petition was filed over six years ago. The State of Utah most certainly has an undeniable interest, deemed important by both the Supreme Court and Congress, to carry out its punishment against Petitioner without further delay. This interest is indeed lost if the State cannot appeal the grant of the *Rhines* stay now. The delay—which is, in itself, a win for Petitioner—is exactly what harms the State's interest. Because delaying review would jeopardize both "a substantial

---

[7] Even so, the Court's analysis of this question is divorced from reality. I suggest if this court could review *Rhines* stays, the court might hold, for example, that "good cause" is akin to "cause" under procedural default. Or perhaps the court would hold that district courts' refusals to take state time and procedural bars into account in deciding whether a claim has potential merit does not comport with AEDPA or *Rhines*'s caution that stays be granted in only "limited circumstances." It would seem to me that if either of those very possible things happened, interlocutory review of *Rhines* stays would undoubtedly speed review over time, given district courts have issued multiple stays based on a lower standard of "good cause" and an understanding that the district court cannot consider time and procedural bars.

public interest" and "some particular value of a high order," the grant of a *Rhines* stay in a capital case is "effectively unreviewable on appeal from a final judgment."

* * *

The Court cites to three other circuits in support of its holding that a grant of a *Rhines* stay is reviewable after final judgment: *Grace v. Vannoy*, 826 F.3d 813 (5th Cir. 2016); *Howard v. Norris*, 616 F.3d 799 (8th Cir. 2010); and *Thompson v. Frank*, 599 F.3d 1088 (9th Cir. 2010). The most important thing to note about *Howard* and *Thompson* is that neither considers "*the decisive consideration*" of "whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk Indus., Inc.*, 558 U.S. at 107 (quoting *Will*, 546 U.S. at 352–53) (emphasis added); *Howard*, 616 F.3d at 802–803; *Thompson*, 599 F.3d at 1090. This alone renders their analyses unpersuasive.

Even if we push that crucial fact aside, these cases otherwise rest on flimsy reasoning. In *Thompson*, the Ninth Circuit indeed held "[a] district court order staying proceedings to allow a state habeas petition to exhaust claims in state court is reviewable on appeal after final judgment." 599 F.3d at 1090. In support, the Ninth Circuit cited two cases: *Valdovinos v. McGrath*, 598 F.3d 568, 573–74 (9th Cir. 2010), *vacated sub nom. Horel v. Valdovinos*, 562 U.S. 1196 (2011), and *Olvera v. Giurbino*, 371 F.3d 569, 574 (9th Cir. 2004). *Olvera* involved a district court's *refusal* to stay proceedings and, therefore, lends no support for the proposition for which the Ninth Circuit cited it. 371 F.3d at 574. *Valdovinos*, a vacated Ninth Circuit opinion, does not support *Thompson*'s holding either. In *Valdovinos*, the State did not even argue the district court erred in

22

granting a *Rhines* stay. Br. for Appellee, *Valdovinos*, 598 F.3d 568 (No. 08-15918), 2009 WL 2444195. Rather, the State argued that "the district court erred in allowing petitioner to amend his petition to include new and revised claims he first presented in his traverse after the AEDPA time limit had passed." *Id.* Of course, because the State did not argue the district court erred in granting a *Rhines* stay, the Petitioner did not argue such an issue was moot. Reply Br., *Valdovinos*, 598 F.3d 568 (No. 08-15918), 2009 WL 2444196. Perhaps confused, the *Valdovinos* court then—totally unsolicited—noted the district court did not abuse its discretion in issuing a *Rhines* stay. 598 F.3d at 573–74. This flippant advisory statement, which was made in passing as the *Valdovinos* court addressed the claim the State actually made in that case, sheds absolutely no light on whether the grant of a *Rhines* stay is effectively unreviewable on appeal from final judgment. Accordingly, by relying solely on *Olvera* and *Valdovinos*, *Thompson* reached its holding on paper-thin support, and this writer cannot take *Thompson* seriously for such a holding.

The Court also cites to *Howard*, which held the grant of a *Rhines* stay "fails the third condition [of the collateral order doctrine] 'because a district court's conclusion about whether a habeas claim has been exhausted is addressable on appeal after final judgment.'" 616 F.3d at 802 (quoting *Thompson*, 599 F.3d at 1090). In *Howard*, the Eighth Circuit noted it was "significant" that the petitioner did not "challenge the district court's application of the three *Rhines* factors, and thus [did] not challenge the delay involved in the stay itself." *Id.* at 803. Instead, the petitioner "challenge[d] the propriety of the stay only as it relate[d] to the merits of whether the district court erred in concluding some of [the petitioner's] claims were unexhausted." *Id.* Thus, *Howard* might not be applicable to

23

our instant case, but even if it is, *Howard*'s sole reliance on *Thompson* in its one-sentence analysis of whether the issues could be addressed on appeal renders its analysis unpersuasive.

The latest circuit to join the conversation is the Fifth Circuit in *Grace*. *Grace* relied on *Thompson* and *Howard*—albeit in conjunction with a more thoughtful analysis—to reach the conclusion that *Rhines* stays are not appealable orders. *Grace*, 826 F.3d at 820–21. Of utmost importance, however, *Grace* was not a capital case. *Id.* at 819 ("Indeed, Grace was sentenced to life in prison; he is not delaying execution of a capital sentence."). The interest involved in *Grace* is completely different than the interest at issue in this case. Capital prisoners have every incentive to delay their proceedings, while other prisoners have every incentive to expedite their proceedings. Because of this inherent difference between capital and non-capital cases, *Grace*'s reasoning is not relevant to the instant capital case. Nothing in these three cases moves me in the slightest from my view that grants of *Rhines* stays in capital cases are effectively unreviewable on appeal from final judgment.

C.

As if satisfying the three collateral order doctrine elements was not enough, the policy behind limiting jurisdiction to "final" orders—which in many cases cuts against the exercise of jurisdiction, *see, e.g.*, *Moses H. Cone*, 460 U.S. at 31 (Rehnquist, J., dissenting)—*supports* our exercise of jurisdiction in this case. One policy behind section 1291's "finality" requirement is to "prevent[] the debilitating effect on judicial administration caused by piecemeal appeal disposition of what is, in practical consequence,

24

but a single controversy." *Coopers & Lybrand*, 437 U.S. at 471 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170 (1974)); *see also Moses H. Cone*, 460 U.S. at 31 (Rehnquist, J., dissenting) ("To be effective, judicial administration must not be leaden-footed."). In other words, the finality requirement of section 1291 prevents unnecessary steps back and forth between the federal district court and the federal appellate court. But ironically, piecemeal litigation is precisely what the issuance of a *Rhines* stay causes![8] Even though federal courts do not feel the "debilitating effect," it is certainly felt by our state brethren who are currently adjudicating Petitioner's supplemental-instruction claim that is in all likelihood time and procedurally barred. The waste of state judicial resources—not to mention the resources of the Utah Office of the Attorney General—is plain. While this is not the particular "debilitating effect on judicial administration" the finality requirement generally aims to prevent, it is no less of a "debilitating effect on judicial administration" in state court. In sum, because a *Rhines* stay already causes piecemeal litigation, the policy behind not exercising jurisdiction here—i.e., preventing piecemeal litigation—rings hollow.

IV.

---

[8] Congress and the Supreme Court have determined this piecemeal litigation, which is specifically caused by the total exhaustion requirement that renders *Rhines* stays necessary, is justified by comity. That is, state courts should have the chance to decide all issues before federal courts do. The Powell Committee questioned whether, in reality, we promote comity by allowing the state court to decide an issue before the federal court can. *See* Powell Comm. Report, *supra* page 1, at 22–23 ("Because of the existence of state procedural default rules, exhaustion is futile in the great majority of cases. It serves the state interest of comity in theory, but in practice it results in delay and undermines the state interest in the finality of its criminal convictions.").

The Supreme Court has made itself perfectly clear that only a "narrow class" of decisions fall within the collateral order doctrine, and I have taken this directive to heart. *See Los Lobos Renewable Power, LLC*, 885 F.3d at 673–76 (Baldock, J., dissenting from the Court's exercise of jurisdiction pursuant to the collateral order doctrine).  The grant of a *Rhines* stay in capital cases, however, is one of the few decisions that falls within the narrow class.  The Supreme Court clearly intended there to be meaningful restrictions on when a district court may issue a *Rhines* stay.  As the district court's order demonstrates, there currently are none.

Because we have jurisdiction pursuant to the collateral order doctrine, I respectfully dissent.  I would proceed to the merits.